C. Daniel HURLBUT, et al., Petitioners,

v.

GULF ATLANTIC LIFE INSURANCE
COMPANY, et al., Respondents.

No. C–4596.

Supreme Court of Texas.

Dec. 16, 1987.

Rehearing Denied May 25, 1988.

W. James Kronzer, Jr., Houston, R. Jack Ayres, Jr., Thomas V. Murto, III, and Larry B. Dwight, Law Offices of R. Jack Ayres, Dallas, for petitioners.

R.B. Cousins, R. Vernon Coe, Thompson, Coe, Cousins & Irons, Dallas, David Maynard, McCutchan, Schmidt, Birkhimer & Druen, Columbus, Ohio, and Royal H. Brin, Jr., Strasburger & Price, Dallas, for respondents.

## OPINION

CAMPBELL, Justice.

Insurance agents C. Daniel Hurlbut and A.C. Hovater sued their former employer, Gulf Atlantic Insurance Company, its parent corporation, and several corporate officers for fraud, business disparagement, and tortious interference with contract rights. After a trial by jury, the trial court rendered judgment for actual and exemplary damages against all defendants. The court of appeals reversed the judgment of the trial court and rendered judgment that Hurlbut and Hovater take nothing, holding that all claims were barred by limitations. 696 S.W.2d 83. We reverse the judgment of the court of appeals and hold that a fact issue was raised regarding when Hurlbut and Hovater should have discovered defendants' fraud. Because the court of appeals additionally held that the great weight and preponderance of the evidence

supported a finding that Hurlbut and Hovater should have discovered the fraud more than two years prior to filing suit, we remand the cause to the trial court for new trial.

## FACTS

The facts are discussed in some detail in the majority and dissenting opinions of the court of appeals and will not be repeated at length here. The following recitation is favorable to the plaintiffs, Hurlbut and Hovater, and from the verdict is apparently the version accepted by the jury.

In the spring of 1974, Hurlbut, Hovater and several officers of Gulf Atlantic met to discuss a new enterprise. At this meeting, representatives of Gulf Atlantic proposed that Hurlbut and Hovater form a partnership to serve as the administrator of a proposed health insurance trust which would sell and service group health insurance policies underwritten by Gulf Atlantic. Following this meeting, Hurlbut and Hovater returned to their home in Houston and formed "Agency Associates." Gulf Atlantic advanced funds to cover start-up costs. Gulf Atlantic also recommended an attorney to Hurlbut and Hovater to use in preparation of the trust documents. After the attorney had drafted the appropriate documents, they were signed by Hurlbut, Hovater and an officer of the bank Agency Associates intended to use as trustee of the premium trust account. The executed trust agreement was then returned to the attorney who Hurlbut and Hovater believed would, in conjuction with Gulf Atlantic, obtain state approval of the master policy.

In the late summer of 1974, Kenneth Thompson, an officer of Gulf Atlantic and Hurlbut and Hovater's primary contact with the company, instructed them to start selling group health insurance under the trust arrangement. When Hurlbut and Hovater inquired about the master policy, they were sent a copy of a proposed policy to be issued to the "West Texas Pipe Trades Health Insurance Trust" with the explanation that Agency Associates' master policy would be virtually identical.

Hurlbut and Hovater sold the group health plan through the fall and winter of 1974. These sales were made without benefit of the master policy. Gulf Atlantic, however, continued to assure Hurlbut and Hovater that all was in order with the program and that the master policy would soon be provided.

Potential clients who were concerned regarding Agency Associates' inability to produce a master policy were referred to Gulf Atlantic by Hurlbut and Hovater. One such client placed a call to Gulf Atlantic in December 1974. Thompson was unavailable so the caller talked with Gulf Atlantic's president, William Barnes, who denied that Gulf Atlantic was underwriting Agency Associates' group health insurance program. This client relayed his conversation to Hurlbut and also contacted the office of the Attorney General.

Hurlbut thereafter contacted Thompson who again reassured him that Gulf Atlantic was still underwriting the program. Hurlbut also contacted Jack Warner, vice president of Nationwide Corporation, the corporate parent of Gulf Atlantic. Warner had initially worked with Hurlbut and Hovater during the formative stages of Agency Associates. Warner also reassured Hurlbut and suggested a meeting between Barnes, Hurlbut and Hovater to straighten out the matter.

This meeting took place in Dallas at Gulf Atlantic's corporate offices on January 21, 1975. There Hurlbut and Hovater were surprised by the appearance of Bill Flanary, an assistant Attorney General assigned to investigate the group health insurance program being sold by Agency Associates. At this meeting Barnes told Flanary that Hurlbut and Hovater did not have authority to write group insurance for Gulf Atlantic through a trust plan.

Following this meeting, Hurlbut and Hovater accompanied Flanary to a local office of the Attorney General in Dallas and cooperated in the investigation. As a result of this investigation and those of local authorities as well, the assets of Agency Associates were placed in receivership, the insurance licenses of Hurlbut and Hovater were revoked and both civil and criminal charges were brought against them. Both Hurlbut and Hovater were arrested and jailed, lost their ability to make a living selling insurance and sustained other damage.

The motivation behind Gulf Atlantic's abandonment of its original arrangement with Hurlbut and Hovater is possibly explained by the difficulty it experienced in obtaining approval of the master policy for West Texas Pipe Trades Health Insurance Trust, the same policy previously provided to Hurlbut and Hovater with the explanation that theirs would be the same. Gulf Atlantic had some difficulty with the State Board of Insurance because it had authorized the sale of group health insurance prior to the approval of this master policy. Rather than acknowledge additional misconduct and complicity in the sales that Hurlbut and Hovater had made prior to issuance of a master policy, it is asserted that Gulf Atlantic decided to conceal its role by denying it had ever agreed to underwrite the program or obtain the state's approval of the master policy and thereby shift the entire responsibility to Hurlbut and Hovater.

On January 21, 1977, Hurlbut and Hovater filed suit against Gulf Atlantic and the other defendants seeking actual and exemplary damages alleging several theories of recovery including fraud, business disparagement and tortious interference with contract rights.

### FRAUD

The jury found that each of the defendants "fraudulently represented to plaintiffs that plaintiffs were authorized to write group health insurance through a trust arrangement to be underwritten by Gulf Atlantic Life Insurance Company." The jury further found that this fraudulent representation was a proximate cause of damages or loss to plaintiffs. The jury also found that each of the defendants entered into a conspiracy to defraud plaintiffs by making such representations and that this conspiracy was a proximate cause of plaintiffs' damages. The jury answered "we do not" in response to issue number 27:

Do you find from a preponderance of the evidence that plaintiffs knew or by the exercise of ordinary care should have known of the fraud, if any, of the defendants on or before January 20, 1975?

Because Hurlbut and Hovater filed suit on January 21, 1977, an affirmative answer to this issue would have barred recovery on the fraud claim under the two year statute of limitations.

In the trial court, Gulf Atlantic and the other defendants moved for judgment in their favor notwithstanding this finding on the grounds that the evidence established as a matter of law that plaintiffs knew or should have known of the fraud on or before January 20, 1975. Although the trial court denied this motion, the court of appeals agreed that the evidence conclusively established the defendants' limitations defense and that there was no evidence supporting the jury's answer to issue 27. First, the court of appeals held that the plaintiffs had admitted in their pleadings knowledge of the fraud in the latter part of 1974, more than two years prior to the filing of the suit. This judicial admission was binding on the plaintiffs and precluded them from introducing evidence to the contrary. Alternatively, the court of appeals held that even if the plaintiffs petition did not constitute an admission to the defendants' limitations defense, the evidence nevertheless conclusively established the defense. We disagree.

■ The defendants cannot benefit from a judicial admission in this case. We need not decide whether plaintiffs' pleadings clearly and unequivocally concede the existence of facts amounting to a judicial admission of limitations because defendants did not stand on this alleged admission. In *Houston First American Savings v. Musick*, 650 S.W.2d 764, 769 (Tex.1983), we said that a party relying on an admission must protect it by objecting to the introduction of evidence contrary to the admission and by objecting to the submission of any issue bearing on the fact or facts admitted. The defendants did not do this in the present case.

The jury's answer to issue 27 is directly contrary to what the defendants contend the plaintiffs admitted in their pleadings. The defendants not only failed to object to the submission of issue 27, they offered their own version of the issue. It was not until their motion for judgment n.o.v. that defendants for the first time pointed out to the trial court that the issue was contrary to an alleged admission in plaintiffs' pleadings. This objection came too late. The defendants had already waived the admission assuming the pleadings admitted knowledge of the fraud more than two years before commencement of the suit.

■ Further the court of appeals' review of the evidence is flawed. Under "no evidence" review the court is required to consider only the evidence and inferences tending to support the jury finding and to disregard contrary evidence and inferences. *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567, 568 (Tex.1985); *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex.1982). Although the court of appeals recites the proper standard, it does not apply it. A comparison of the facts recited by the court of appeals in the majority and dissenting opinions amply demonstrate this point. The majority viewed the fraud issues and the discovery issue, issue 27, to refer only to Gulf Atlantic's representation that plaintiffs were authorized to sell insurance because the company had obtained state approval of the master policy. Once the plaintiffs learned that the master policy had not in fact been approved, the majority concluded that plaintiffs could no longer rely on "further representations of the same sort" and thereby postpone the running of limitations. 696 S.W.2d at 92.

The dissent in the court of appeals, however, concluded that Gulf Atlantic's subsequent assurances were not mere repetition of the original fraudulent statements. Instead, the subsequent assurances conveyed that although approval of the master policy was not yet accomplished Gulf Atlantic was working on the problem and intended to underwrite the program. The dissent's analysis more closely comports with the "no evidence" standard of review. In

short, we agree that whether plaintiffs knew or should have known of the fraud in light of the knowledge they had in the latter days of 1974 and the first part of January 1975, coupled with the assurances of Gulf Atlantic, raises a fact issue which the jury resolved in plaintiffs' favor by its negative answer to issue 27.

■ In an unpublished supplement to its published opinion, the court of appeals also found the jury's answer to issue 27 to be against the great weight and preponderance of the evidence. The court's review of the evidence in its unpublished work complies with our recent opinion in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986). Other than application of the proper legal standard, we lack jurisdiction to consider points challenging the factual sufficiency of the evidence. *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985).

## BUSINESS DISPARAGEMENT AND TORTIOUS INTERFERENCE WITH CONTRACT RIGHTS

The plaintiffs also obtained favorable jury findings on their claims of business disparagement and tortious interference with contract. In analyzing these claims and the evidence supporting them, the court of appeals concluded that they were in essence a claim for slander and barred by the one year statute of limitations. TEX.REV.CIV.STAT.ANN. Art. 5524(1) (Vernon 1958). We find no reversible error in the judgment of the court of appeals as it pertains to these two claims.

■ The general elements of a claim for business disparagement are publication by the defendant of the disparaging words, falsity, malice, lack of privilege, and special damages. J. Fleming, *The Law of Torts* at 697–700 (5th Ed.1977); Annot., 74 A.L.R.3d 298, 301 (1976). The tort is part of the body of law concerned with the subject of interference with commercial or economic relations. The Restatement identifies the tort by the name "injurious falsehood" and notes its application "in cases of the disparagement of property in land, chattels, or intangible things or of their quality." Re-

statement (Second) of Torts § 623A, comment a (1977).

The court of appeals recognizes that an action for injurious falsehood or business disparagement is similar in many respects to an action for defamation. Both involve the imposition of liability for injury sustained through publications to third parties of a false statement affecting the plaintiff. The two torts, however, protect different interests. The action for defamation is to protect the personal reputation of the injured party, whereas the action for injurious falsehood or business disparagement is to protect the economic interests of the injured party against pecuniary loss.

■ More stringent requirements have always been imposed on the "plaintiff seeking to recover for injurious falsehood in three important respects—falsity of the statement, fault of the defendant and proof of damage." Restatement (Second) of Torts § 623A, comment g (1977). Regarding falsity, the common law presumed the defamatory statement to be false and truth was a defensive matter. The plaintiff in a business disparagement claim, however, must plead and prove the falsity of the statement as part of his cause of action. Regarding fault, the defendant in a defamation action was held strictly liable for his false statement whereas the defendant in an action for business disparagement or injurious falsehood is subject to liability "only if he knew of the falsity or acted with reckless disregard concerning it, or if he acted with ill will or intended to interfere in the economic interest of the plaintiff in an unprivileged fashion." *Id.* Finally regarding damages, the common law required plaintiff in a defamation action to prove special damages in only a limited number of situations, whereas pecuniary loss to the plaintiff must always be proved to establish a cause of action for business disparagement.

In the present case there is evidence to support findings that the statements of Gulf Atlantic were false and malicious in the sense that Gulf Atlantic knew them to be false. It is, however, with the element

of special damages that the plaintiffs have some difficulty.

■ Proof of special damages is an essential part of the plaintiffs' cause of action for business disparagement. The requirement goes to the cause of action itself and requires that plaintiff "establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales." W. Keeton, *Prosser and Keeton on the Law of Torts*, § 128 at 971 (5th Ed.1984). Furthermore, the communication must play a substantial part in inducing others not to deal with the plaintiff with the result that special damage, in the form of the loss of trade or other dealings, is established. *Id.* at 967; Restatement (Second) of Torts § 632 (1977).

■ Our examination of the record reveals no evidence of the direct, pecuniary loss necessary to satisfy the special damage element of a claim for business disparagement. The court of appeals found no evidence of special injury to the business, writing:

> No evidence was offered of damages resulting from loss of business expected from any particular customer or prospective customer to whom disparaging statements were made by defendants. The damages alleged and proved resulted only indirectly from the disparaging statements alleged, and more immediately from the receivership, the orders revoking their licenses, and their prosecution for misappropriation of insurance premiums.

696 S.W.2d at 98–9. In this regard we agree with the Court of Appeals that the damages proven were personal to the plaintiffs.

■ Similarly, the plaintiffs have not produced evidence supporting a claim for tortious interference with contract. As the court of appeals observed, plaintiffs did not allege or prove "any contract rights with which defendants interfered, other than Gulf Atlantic's own breach of contract with them and plaintiffs have asserted no claims for breach of contract." 696 S.W.2d at 100.

It is difficult to imagine a set of circumstances under which plaintiffs' theories of fraud and tortious interference with contract can co-exist. Although no specific contracts were proven, it was plaintiffs' testimony that any contract rights between their agency and the entities to which they were selling group health insurance were to be underwritten by Gulf Atlantic. Hurlbut and Hovater were acting as agents for Gulf Atlantic and the economic benefits they expected from these contracts were to come from Gulf Atlantic in the form of commissions. Perhaps Gulf Atlantic breached its contract with plaintiffs when it refused to honor their agreement and perhaps Gulf Atlantic's conduct in the matter was fraudulent, but we see no evidence here supporting plaintiffs' claim that Gulf Atlantic tortiously interfered with any specific contract rights.

## PRIVILEGE

In deference to the factual insufficiency holding of the court of appeals, we must remand this case for new trial, but we do not intend that this remand limit the parties in developing and proving any particular theory at trial. In this regard we must address an alternative holding of the court of appeals on privilege. The court concluded that the false statements made by Gulf Atlantic to the assistant attorney general were absolutely privileged and could not form the basis of a suit for damages.

This holding is apparently predicated on the absolute privilege which attaches to the testimony of a witness in a judicial proceeding. The Restatement describes this privilege as follows:

> A witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding.

Restatement (Second) of Torts § 588 (1977). The court of appeals found the law "well established that ordinarily no action for damages lies for a statement made in the course of a judicial proceeding though the

language be false and published with express malice." 696 S.W.2d at 99.

Privileges applicable to defamation are of two classes—absolute and conditional or qualified. See Restatement (Second) of Torts §§ 583–612 (1977). Both are based on public policy concerns which elevate the good to be accomplished by the free and open exchange of information over the harm which may result from a falsehood.

■ An absolute privilege is more properly thought of as an immunity because it is based on the personal position or status of the actor. W. Keeton, *Prosser & Keeton on the Law of Torts*, § 16 at 109 (5th Ed.1984). When the privilege is absolute, the actor's motivation is irrelevant. It is not conditioned upon the honest and reasonable belief that the defamatory matter is true or upon the absence of ill will on the part of the actor. Such immunity, however, attaches only to a limited and select number of situations which involve the administration of the functions of the branches of government, such as statements made during legislative and judicial proceedings. 3 J. Dooley, *Modern Tort Law*, § 36.09 (B. Lindahl Ed. 1984 and Supp. 1987).

Privileges of the second class, the conditional or qualified privilege, are true privileges because they arise out of the occasion upon which the false statement is published. They do not rise to the level of an immunity. The occasions which may give rise to a conditional privilege are described in the Restatement. Restatement (Second) of Torts §§ 594–598A (1977).

In the present case the court of appeals found the evidence conclusively established an absolute privilege because the "defamatory or disparaging statement was made to a *public official* or was made in the course of a judicial or quasi-judicial proceeding." 696 S.W.2d at 100 (emphasis ours). We, however, do not see the evidence to be conclusive on this point.

■ All communications to public officials are not absolutely privileged. *Zarate v. Cortinas*, 553 S.W.2d 652 (Tex.App.— Corpus Christi 1977, no writ). The occa-

sion of Gulf Atlantic's communication to the assistant attorney general in this case is best analogized to the conditional privilege described in section 598 of the Restatement, "Communication to One Who May Act in the Public Interest:"

> An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
>
> (a) there is information that affects a sufficiently important public interest, and
>
> (b) the public interest requires the communication of the defamatory matter to a public officer or a private citizen who is authorized or privileged to take action if the defamatory matter is true.

Restatement (Second) of Torts § 598 (1977).

■ A conditional privilege is defeated when the privilege is abused. *Id.* § 599. Abuse may be found when the person making the defamatory statement knows the matter to be false or does not act for the purpose of protecting the interest for which the privilege exists. *Id.* §§ 600–603. The distinction between absolute and conditional privileges significant to our present case is that an absolute privilege confers immunity regardless of motive whereas a conditional privilege may be lost if the actions of the defendant are motivated by malice.

■ In the context of a tort such as business disparagement or injurious falsehood, only absolute privileges have relevance to the defendant. This is because the tort itself incorporates malice as an element of recovery; hence, if the plaintiff carries his burden, he likewise defeats any conditional privilege.

## CONCLUSION

Although we agree with the court of appeals that the evidence developed in the present record suggests the submission of claims for fraud, and perhaps malicious prosecution and breach of contract, we do not foreclose any other theories which may on retrial find support in the evidence. The judgment of the court of appeals is

reversed and the cause is remanded to the trial court for new trial.

HILL, C.J., not sitting.

## ON MOTION FOR REHEARING

ROBERTSON, Justice, dissenting.

This lawsuit was originally filed eleven years ago. After a lengthy trial, the jury returned findings of fact that were in every way favorable to C. Daniel Hurlbut and A.C. Hovater. The trial judge rendered a judgment in favor of Hurlbut and Hovater based upon that jury verdict.

During the three and one-half years the case was pending in the court of appeals, A.C. Hovater died. Thus, this case presents the perfect example of the truth of the maxim that "justice delayed is justice denied." There is no longer any possibility of justice for Hovater. His heirs have assumed the pursuit of his appeal.

Now, eleven years after Hurlbut and Hovater first went to court seeking a remedy for their wrong, this court remands the cause back to the trial court for a new trial. The parties will begin the process all over again. How many more years will it be before the case is finally resolved and the wrong is made right?

And what is the reason for why this court is sending these parties back to try their case again? It is because two court of appeals judges, sitting at their desks, looked at a printed transcript of the trial and decided that the jury was wrong. They concluded that the jury's negative answer to issue 27 was against the great weight and preponderance of the evidence.[1] These two judges did not see the witnesses in person or listen to their voices; instead, they sat in their offices and looked only at a cold record. And this court has said that the decision of those two judges is final and that we are powerless to do anything about it.

I believe that the ordinary citizen of Texas would be outraged to learn that this is how our system of justice operates. Our Texas Constitution guarantees that "the right of trial by jury shall remain inviolate." TEX. CONST. art. I, § 15. This valuable right is fundamental to our entire system of jurisprudence. It is a right premised on the dignity of the ordinary citizen in whom our society entrusts the power to decide the facts of litigated disputes.

If two out of three judges sitting on an appellate panel can reweigh the evidence and undo the work of a jury who listened in person to all the evidence, then it can no longer be said that the right of trial by jury is "inviolate." Instead, that right is debased and diminished. However, we cannot place on courts of appeals the responsibility for this debasement of the right to jury trial. This court has given them that power and it is time we acknowledge our own error and deal with it.

The problem stems from Article V, section 6 of the Texas Constitution which provides that the decision of courts of appeals "shall be conclusive on all questions of fact brought before them on appeal or error." This provision is one of the most troublesome phrases in all of Texas jurisprudence. *See* G. Braden, ed., *The Constitution of the State of Texas: An Annotated and Comparative Analysis* 400 (1977). This court has a long history of trying to construe this provision and of trying to do so in a manner that would not abridge the right of trial by jury. *See, e.g. Choate v. San Antonio & A.P. Railway Co.*, 91 Tex. 406, 44 S.W. 69 (1898); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). Through our own opinions, we have instructed courts of appeals to weigh all the evidence in a case to determine if it is insufficient to support the verdict or if the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *In re*

---

1. In addition to this "great weight and preponderance" point challenging the jury's negative response on an issue, Gulf Atlantic also had before the court of appeals unconsidered points of error contending that the evidence was factually insufficient to support affirmative findings by the jury. Therefore, I choose to address both halves of appellate factual sufficiency review.

*King's Estate.* By and large, the courts of appeals have attempted to follow our instructions and rightfully so.

In more recent years, we have discussed the problem as being a conflict between two constitutional provisions: article I, section 15 and article V, section 6. *See, e.g. Pool.* However, the reality is that the conflict does not appear on the face of these provisions; it exists only by virtue of the construction we have placed on article V, section 6. The Constitution itself says nothing about allowing courts of appeals to weigh the evidence in a case or about giving them the power to review for sufficiency of the evidence. It is this court which has engrafted this meaning onto the nebulous and indeterminate language of article V, section 6. In doing so, we ourselves have created the conflict and have permitted an unconstitutional infringement upon the right of trial by jury.

Our long history of permitting this type of appellate review and the legal labels [2] we have attached to the process have assuaged us into accepting its propriety. However, I now conclude that permitting courts of appeals to engage in a process of weighing the evidence is in reality allowing them to substitute their own thought processes for those of the jury. Any distinction between the two is a distinction that exists in semantics only and not in practice. No matter how many ways we try to articulate a standard, the reality is that a judge simply cannot engage in a process of weighing all the evidence without engaging in the same process as the jury. This is wrong. The jury, not the court, is the fact finding body; and the jury is the exclusive judge of the credibility of witnesses and the weight to be given their testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951).

The 1876 Constitution preserved the right of trial by jury as it had developed in the common law up to that time. *See*

*White v. White,* 108 Tex. 570, 196 S.W. 508 (1917). My review of early case law convinces me that the Texas Supreme Court, as the only appellate court at the time, did not exercise anything akin to the type of review over jury verdicts that is now being exercised by the courts of appeals. *See Carter v. Carter,* 5 Tex. 93 (1849); *Love v. Barber,* 17 Tex. 312 (1856); *Branch v. Dever,* 18 Tex. 612 (1857); *City of San Antonio v. Lane,* 32 Tex. 405 (1869); *Ward and Co. v. Bledsoe and Clarkson,* 32 Tex. 252 (1869). When the courts of civil appeals were created by constitutional amendment of 1891, they were not granted any additional powers over facts beyond what had previously been exercised by this court. *See Choate.* Therefore, because this court did not exercise any power to review jury verdicts for sufficiency of the evidence, the courts of appeals cannot rightfully have such a power either. By allowing such an evolution of the power of courts of appeals, we have sullied the right of trial by jury and violated the constitutional guarantee that this right would remain inviolate.

The sanctity of the right of trial by jury should be restored. The fact that we have permitted this unconstitutional infringement on the right of jury trial to continue for nearly a hundred years does not give it legitimacy. By force of time alone, we cannot allow the basic rights afforded the people under the constitution to be usurped. The unconstitutionality of the course pursued has now been made clear to us and should compel us to act.[3] The question is whether we will continue to adhere to a prior interpretation of article V, section 6 which has allowed appellate courts to unconstitutionally usurp the jury's function. *See Dyson v. Olin Corp.,* 692 S.W.2d 456, 458 (Tex.1985) (Robertson, J., concurring).

I would now abandon the practice of permitting courts of appeals to review evi-

---

2. I.e., "insufficiency" of the evidence and "against the great weight and preponderance" of the evidence.

3. The phrasing is borrowed from *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a case in which the U.S.

Supreme Court overturned a hundred years of precedent, stating that "no lapse of time or respectable array of opinion" should make them hesitate to correct an unconstitutional assumption of powers.

dence for factual insufficiency or to decide if the jury verdict is against the great weight and preponderance of the evidence. The power that a court of appeals has over facts under article V, section 6 should be limited to reviewing fact-findings made by a trial judge and not those made by a jury.

No system of justice is perfect. Juries do make mistakes. However, appellate judges are also fallible. In attempting to provide a safeguard against the mistakes of juries, we have simply substituted the mistakes of appellate judges.

This issue goes to the heart of how our society distributes power. As a people, we have chosen by our social compact to place power over the resolution of factual disputes in the hands of common citizens rather than in the hands of an elite group of judges. Along with the right to vote, the right of trial by jury is one of the ways our society disperses power rather than concentrating it in the hands of a few.

It is our job as judges to ensure the preservation to the people of the rights guaranteed in the constitution. Moreover, we must ensure that those rights retain real meaning and do not become mere formalisms. To the people of our state, a jury trial is more than a ceremonial symbol of political freedom; it is a process with real meaning. We cannot permit this right to deteriorate to the point that a jury verdict is allowed to stand only if it agrees with the view of the evidence taken by appellate judges.

I would not remand this cause back for a new trial. A qualified jury has already decided the fact question relating to the plaintiffs' knowledge of the fraud. Hurlbut is entitled after eleven years to finally get his judgment based upon the jury verdict. I would affirm the judgment of the trial court.

RAY and MAUZY, JJ., join in this dissent.

