**DOUBLE DIAMOND, INC. and White Bluff Property Owners' Association, Inc., Appellants,**

v.

**Daniel SATURN, Appellee.**

No. 05–09–01073–CV.

Court of Appeals of Texas, Dallas.

April 5, 2011.

Jay J. Madrid, Winstead Sechrest & Minick, P.C., Kent B. Pearson, Winstead PC, Dallas, TX, David Fowler Johnson, Winstead PC, Fort Worth, TX, Craig T. Enoch, Winstead PC, Austin, TX, for Appellants.

Barbara Thompson Hale, Blanscet, Sutherland, Hooper & Hale, L.L.P., Addison, TX, Steven Dominic Sanfelippo, Rose Walker, L.L.P., Dallas, TX, for Appellee.

Before Justices MOSELEY, MARTIN RICHTER, and MYERS.

## OPINION

Opinion By Justice MYERS.

Double Diamond, Inc. and White Bluff Property Owners' Association, Inc. appeal the trial court's judgment in favor of Daniel Saturn. Appellants bring six issues asserting the trial court erred in awarding declaratory judgment and attorney's fees in favor of appellee and in rendering a take-nothing judgment on Double Diamond's business-disparagement cause of action. We affirm the trial court's judgment that appellants take nothing on their causes of action except for the claim for attorney's fees, and we render judgment that appellee take nothing on his claims for declaratory judgment and injunctive relief. We reverse the trial court's award of attorney's fees to appellee and we remand the cause to the trial court for further proceedings on the parties' claims for attorney's fees.

## BACKGROUND

In 1990, Double Diamond, Inc., a Texas corporation, began developing the White Bluff Resort, a residential community on Lake Whitney with access to various "hospitality" operations, including golf courses, marina, spa, exercise facilities, and restaurants in the resort. Double Diamond sold undeveloped lots within the community. The president of the Owners' Association was Mike Ward, who was also president of Double Diamond. Several of the Owners' Association's directors were also executives of Double Diamond. Double Diamond was owned by Double Diamond–Delaware, Inc., and Ward was the majority shareholder of Double Diamond–Delaware. Besides owning Double Diamond with the White Bluff Resort, Double Diamond–Delaware's other subsidiaries also owned another three resorts.

Purchasers of the lots became members of the Owners' Association. Most members of the Owners' Association owned undeveloped lots. By the time of trial, Double Diamond had sold about 6000 lots, but only about 600 homes had been built.

The Owners' Association and Double Diamond had an agreement whereby Double Diamond would pay the Owners' Association a percentage of the rental income on condominiums, but when that system became unworkable in 1997, they amended the agreement to provide that Double Diamond would pay the Owners' Association $50,000 annually.

The Owners' Association did not own the hospitality operations; they were owned by White Bluff Club Corp., a wholly owned subsidiary of Double Diamond. The hospitality operations never earned a profit, and Club Corp.'s losses some years were $700,000. Double Diamond paid off the losses of its subsidiary, Club Corp.

Double Diamond's executives believed the losses were due to members not using the hospitality facilities. In 2004, Double Diamond and the Owners' Association devised a plan, the food and beverage program, to reduce the losses by encouraging members to use the facilities. The Owners' Association sent a letter to the members in January 2004 explaining the food and beverage program. In this program, each member would initially be charged $100 annually and receive a credit for the hospitality facilities of $150. By the time of trial, the charge was raised to $200 annually for a credit of $250. The members had to use the credits within the calendar year. Members who did not use their credits could give them away or sell them. Testimony showed some members bought numerous credits from other members for the amount paid by the members (e.g.,

$200 for $250 credit), while other members testified they had to sell their credits for less than they were charged.

The Owners' Association collected the charges for the program. Each month, the Owners' Association transferred from its bank account to Club Corp.'s bank account the amount of credits used by the members during that month. At the end of the year, any money from unused credits was transferred to Club Corp. The food and beverage program reduced Club Corp.'s losses, but it continued to lose money.

In 2006, Double Diamond and the Owners' Association agreed that Double Diamond would make various improvements to the resort costing over a million dollars and that the Owners' Association would continue the food and beverage program for another ten years. They also agreed that Double Diamond would no longer have to make the $50,000 annual payments to the Owners' Association.

In 2000, appellee bought a lot at the resort, but he never built a house on the lot. Appellee testified he did not receive the January 2004 letter describing the food and beverage program. The first time appellee learned of the program was in a bill for the maintenance fees when he saw he was charged fifty dollars for food and beverage. Appellee protested that he did not order any food and beverage so he did not owe the fee. When he learned the purpose of the fee, he considered it illegal and refused to pay it. Appellee then began to work for the repeal of the food and beverage charges. He obtained the names and addresses of the members from public sources. He sent a letter to appellants threatening to send a letter to each member exposing the allegedly illegal nature of the food and beverage charges if Double Diamond did not repeal the program, refund the food and beverage charges, and buy back his lot. Double Diamond refused his demands and threatened to sue him if he sent the letter. Appellee then sent each member a letter. Appellee also sent emails containing pejorative statements about appellants to members who contacted him.

Double Diamond's sales staff testified that most of the marketing for the resort was through the members' referrals of their friends and families and through encouraging members to trade their current lots for better lots in the White Bluff Resort or for lots in another Double Diamond resort. After appellee sent his letter to the members, Double Diamond's sales staff reported "very, very negative feedback" from the members they contacted about referring or trading. According to the sales staff, referrals and trades dropped significantly after appellee sent out his letter, and Double Diamond's personnel blamed appellee's letters to the members for the drop in sales.

After appellee sent the letter to the members, appellants sued appellee for business disparagement and for recovery of the food and beverage charges appellee had refused to pay. They also requested a declaratory judgment that the food and beverage program was proper and in accordance with the Owners' Association's bylaws and that appellee, as a member of the Owners' Association, was subject to the program. Appellee filed a counterclaim for declaratory judgment seeking declarations that the food and beverage program was illegal because the businesses it supported were private, for-profit businesses that did not meet the definitions of "Common Properties" and "common facilities" in the Owners' Association's bylaws. Appellee also moved for an injunction against appellants to prohibit them from assessing future food and beverage charges against him, foreclosing on his lot, or making negative credit reports

against him for refusing to pay the charges. Both sides sought attorney's fees under the Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (West 2008).

At trial, the jury found Double Diamond failed to prove that appellee disparaged Double Diamond's business. The jury also answered "no" to the question of whether the food and beverage charges collected by the Owners' Association and paid to Double Diamond or its related companies were reasonable compensation for services rendered to the Owners' Association. Following the jury's verdict, the trial court rendered a take-nothing judgment against appellants on their causes of action against appellee. The court also declared (a) the food and beverage program was not in accordance with the Owners' Association's bylaws; (b) the Owners' Association's payments of the food and beverage assessments to Double Diamond and its related companies were not reasonable compensation for the services the companies provided, violating the Texas Non–Profit Corporation Act; and (c) the food and beverage program was "void *ab initio* only as to the parties of this suit." The court also awarded appellee injunctive relief and attorney's fees.

## FOOD & BEVERAGE PROGRAM

In the first issue, appellants contend the trial court erred in entering the declaratory judgment that the food and beverage program was invalid.

### Requirement of Reasonable Compensation and Jury Question 5

Appellee argued to the trial court that the food and beverage charges were not allowed by the bylaws and were invalid under the Non–Profit Corporation Act because the food and beverage funds that the Owners' Association paid to the Double Diamond entities did not constitute "reasonable compensation" for services rendered by the Double Diamond entities. Article 6(g) of the bylaws provided:

> Insofar as permitted by law, [the directors have authority] to do any other thing that, in the opinion of the Board of Directors of the Association, will promote the common benefit and enjoyment of the Owners and residents of the properties; provided, however, that no part of the net earnings of the Association shall inure to the benefit of or be distributable to any member, director or officer of the Association, or any private individual (except that reasonable compensation may be paid for services rendered to or for the Association related or pertaining to one or more of its purposes) . . . .

The Non–Profit Corporation Act provided,

> No dividend shall be paid and no part of the income of a corporation shall be distributed to its members, directors, or officers. A corporation may pay compensation in a reasonable amount to its members, directors, or officers for services rendered, may confer benefits upon its members in conformity with its purposes, and upon dissolution or final liquidation may make distributions to its members, but only as permitted by this Act.

TEX.REV.CIV. STAT. ANN. art. 1396–2.24 (expired Jan. 1, 2010).[1]

After the close of appellee's case in chief, appellants moved for instructed verdict on appellee's request for declaratory

---

1. Act of Apr. 27, 1959, 56th Leg., R.S., ch. 162, art. 2.24, 1959 Tex. Gen. Laws 286, 297, *expired on Jan. 1, 2010,* Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 4, 2003 Tex. Gen. Laws 267, 595 (current version at TEX. BUS. ORGS. CODE ANN. §§ 22.053, .054(1) (West 2010)).

judgment. When appellants' counsel argued that appellee's claim concerning the hospitality facilities not being "common properties" lacked merit, the trial court interrupted appellants' counsel and said the court found the board of directors of the Owners' Association acted within its discretion in approving the food and beverage program. The court then stated, "My question is whether or not there was reasonable compensation.... I don't think there was anything improper about this program except they may not have gotten reasonable compensation...."

Jury Question 5 concerned the issue of reasonable compensation. That question stated:

> Are the food and beverage assessments collected by the White Bluff Property Owners' Association and paid to Double Diamond, Inc. and/or its related companies reasonable compensation for services rendered to or for the White Bluff Property Owners' Association related or pertaining to one or more of the Association's purposes?

> You are instructed that the White Bluff Property Owners' Association is prohibited from distributing dividends, income, or net earnings, if any, to any member, director or officer of the White Bluff Property Owners' Association or any private individual, unless such payment is reasonable compensation for services rendered to or for the White Bluff Property Owners' Association related or pertaining to one or more of its purposes.

The jury answered "No."

### Motion for Instructed Verdict

■ In issue 1(a), appellants argue the trial court erred in denying appellants'

"motion for instructed verdict on the validity of the [food and beverage] Program." Appellants do not cite to the location in this voluminous record where they moved for "instructed verdict on the validity of the Program." The only motion for instructed verdict appellants made was following the close of appellee's case in chief where they requested an instructed verdict on appellee's declaratory judgment claims.

In their motion for instructed verdict, appellants first argued that appellee's request for declaratory judgment should be denied as a matter of law because it was "a mirror image of that submitted by and prayed for by [appellants]." They also argued that appellants' request for declaratory judgment concerning whether the hospitality facilities were "common properties" lacked merit. On appeal, appellants argue that the trial court should have granted the motion for instructed verdict because provisions in the bylaws other than article 6(g) permitted the food and beverage program without the "reasonable compensation" requirement of article 6(g).[2]

Because appellants' arguments on appeal concerning their motion for instructed verdict vary from those made at trial, they have not preserved their arguments for appellate review. *See* TEX.R.APP. P. 33.1; *Exxon Corp. v. Miesch,* 180 S.W.3d 299, 338 n. 10 (Tex.App.-Corpus Christi 2005), *aff'd in part & rev'd in part on other grounds,* No. 05–1076, 2010 WL 5133461 (Tex. Dec. 17, 2010). We overrule appellants' issue 1(a).

### Failure to Render Declaratory Judgment for Appellants

■ In the second issue, appellants contend the trial court should have rendered

---

**2.** Appellants made a similar argument in their response to appellee's motion for instructed verdict after appellants rested in their case in chief. At that time, appellee had not yet presented his case in chief. As the trial court stated, it was not appropriate for appellants to move for instructed verdict on appellee's case at that time. Appellants did not present this argument in their motion for instructed verdict.

declaratory judgment for them and not for appellee because they conclusively proved the reasonableness of the compensation as a matter of law. Appellants also assert the jury's "No" answer to Jury Question 5 was against the great weight and preponderance of the evidence.

When a party attacks the legal sufficiency of an adverse finding regarding an issue on which it has the burden of proof, the party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (per curiam) (Tex.2001) (citing *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989)). In reviewing such a challenge, we must first examine the record for evidence that supports the finding, crediting favorable evidence if reasonable jurors could, while disregarding all evidence to the contrary, unless reasonable jurors could not disregard it. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005); *Dow Chem. Co.,* 46 S.W.3d at 241. If there is no evidence to support the finding, we then examine the entire record to determine if the contrary proposition is established as a matter of law. *Dow Chem. Co.,* 46 S.W.3d at 241. The issue will be sustained only if the contrary proposition is conclusively established. *Id.*

When reviewing the factual sufficiency of evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Cameron v. Cameron,* 158 S.W.3d 680, 683 (Tex.App.-Dallas 2005, pet. denied). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the jury, as fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller,* 168

S.W.3d at 819; *Hinkle v. Hinkle,* 223 S.W.3d 773, 782 (Tex.App.-Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would reach a different answer on the evidence. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Hinkle,* 223 S.W.3d at 782.

Appellants rely on the evidence that in exchange for the food and beverage charges, the members received credits for use of the amenities of at least 125 percent of the charges. However, the evidence also showed that not all residents used or transferred their credits, yet the charges collected from those members were still transferred to Club Corp. Appellants presented no evidence of how much of the charges were for services actually rendered from the use of the credits and how much of the charges were paid to Club Corp. despite the credits not being used.

Appellants also assert the food and beverage charges were reasonable compensation for services to the Owners' Association because, under the 2006 agreement extending the food and beverage program for ten years, Double Diamond agreed to make a million dollars' worth of capital improvements for the resort that otherwise would have been paid for by the Owners' Association. However, before the 2006 agreement, Double Diamond had paid the Owners' Association $50,000 each year. Part of the agreement for the capital improvements was that Double Diamond would no longer make the annual payments to the Owner's Association. Thus, under the 2006 agreement, Double Diamond and its subsidiaries would receive during the extended ten-year period over $11 million in food and beverage funds from the Owners' Association[3] and be re-

---

3. The agreement provided that the food and beverage charges would be $150 per member

in 2006, $175 in 2007, and at least $200 in 2008 through 2015 (the charges could be in-

lieved of a $500,000 liability to the Owner's Association in exchange for $1 million of capital improvements. Although the members of the Owners' Association received benefits totaling the amount of the food and beverage credits they actually used, there was no evidence as to that amount. And although the value of the lots of the Owners' Association's members might be increased by the presence of Club Corp.'s hospitality operations, there was no evidence as to the amount of such property-value increases. These facts constitute some evidence that the food and beverage funds paid by the Owners' Association to Club Corp. were not reasonable compensation for services rendered to the Owners' Association by Club Corp.

Thus, appellants failed to conclusively establish that the food and beverage charges paid to Club Corp. were reasonable compensation for services rendered to the Owners' Association by Club Corp. We also conclude the jury's "No" answer to Jury Question 5 is not so contrary to the evidence as to be clearly wrong and unjust. We overrule appellants' second issue.

### Rendering Declaratory Judgment for Appellee

In issue 3, appellants assert that Jury Question 5 did not support the rendition of declaratory judgment in appellee's favor. Appellants argue that because appellee was the party seeking to invalidate the food and beverage program, he had the burden to request affirmative findings that the food and beverage charges were "not reasonable compensation." However, appellee's requested question, Jury Question 5, asked whether the charges were "reasonable compensation."

The trial court instructed the jury that a "Yes" answer to a question "must be based on a preponderance of the evidence. If you do not find that a preponderance of the evidence supports a 'Yes' answer, then answer 'No.'" The jury's answer of "No" to Jury Question 5 demonstrates the jury concluded that a finding that the food and beverage charges "paid to Double Diamond, Inc. and/or its related companies" were reasonable compensation for services rendered to the Owners' Association was not supported by a preponderance of the evidence. Appellants rely on *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686 (Tex. 1989), in support of their argument that the jury's "No" answer did not support the trial court's award of declaratory judgment for appellee.

In *Sterner*, the plaintiff sued the defendant, Marathon, for tortious interference with a contract. *Id.* at 688. The trial court submitted to the jury Marathon's affirmative defense that its interference was justified or legally excused. *Id.* at 689. The jury found Marathon failed to meet its burden of proving the interference was justified or excused. *Id.* at 690. On appeal, both Marathon and the court of appeals described the jury's answer as a finding that Marathon's interference was not justified or excused. The supreme court stated that Marathon and the lower court misinterpreted the jury's finding. "Properly interpreted, the answer represents only a refusal by the jury to find from a preponderance of the evidence that Marathon acted *with* justification or excuse, and means, in law, that the defendant failed to carry its burden of proof." *Id.*; see also *Grenwelge v. Shamrock Reconstructors, Inc.*, 705 S.W.2d 693, 694 (Tex.

creased by up to five percent annually after 2008). Multiplied by 6,000 members, the food and beverage charges would be $900,000 in 2006, $1,050,000 in 2007, and at least $1,200,000 annually for 2008 through 2015. For the ten-year period, the food and beverage charges for the 6,000 members would be at least $11,550,000.

1986) (per curiam) ("The jury's failure to find that Shamrock breached the contract merely means that the Grenwelges failed to carry their burden of proving the fact. It does not mean the reverse, that Shamrock substantially performed the contract."); *Indigo Oil, Inc. v. Wiser Oil, Inc.*, No. 05–96–00984–CV, 1998 WL 839591, at *16 (Tex.App.-Dallas Dec. 7, 1998, pet. denied) (not designated for publication) ("If both parties sue for declaratory relief on an issue, each must carry its own burden on its request for relief. A jury's negative answer to a question means only the party with the burden of proof on that issue failed to carry its burden." Citations omitted); *Johnson Roofing, Inc. v. Staas Plumbing Co.*, 823 S.W.2d 783, 786 (Tex. App.-Waco 1992, no writ) ("The 'No' answer to the broad-form submission of Question 1 represented a failure of proof ..., not an affirmative finding that no breach occurred.").

Likewise, in this case, the jury's "No" answer to Jury Question 5 is a finding that there was not a preponderance of the evidence showing the food and beverage charges were reasonable compensation for services rendered to the Owners' Association. The jury's answer is an affirmative finding that appellants did not carry their burden of proof to show the food and beverage program complied with the bylaws because the charges constitute reasonable compensation, but it is *not* an affirmative jury finding that *appellee* carried his burden of proof to show that the food and beverage program violated the bylaws because the charges did not constitute reasonable compensation.

The trial court's declaratory judgment that the food and beverage program was not in accordance with the bylaws and that it violated article 1396–2.24 of the Non–Profit Corporations Act was based on the jury's "No" answer to Jury Question 5 and

the court's interpretation of the answer as constituting a finding that the food and beverage charges were not reasonable compensation. We conclude the trial court erred in rendering declaratory judgment for appellee based on the jury's answer to Jury Question 5. We sustain appellants' third issue to the extent it contends the trial court erred in granting declaratory judgment based on the answer to Jury Question 5.

### Appellee's Waiver of Reasonable Compensation Issue

■ In issue 1(c), appellants contend appellee waived any claim as to a lack of reasonable compensation as required by the bylaws because there was no jury finding of a lack of reasonable compensation. Texas Rule of Civil Procedure 279 provides,

Upon appeal all independent grounds of recovery or of defense not conclusively established under the evidence and no element of which is submitted or requested are waived. When a ground of recovery or defense consists of more than one element, if one or more of such elements necessary to sustain such ground of recovery or defense, and necessarily referable thereto, are submitted to and found by the jury, and one or more of such elements are omitted from the charge, without request or objection, and there is factually sufficient evidence to support a finding thereon, the trial court, at the request of either party, may after notice and hearing and at any time before the judgment is rendered, make and file written findings on such omitted element or elements in support of the judgment.

Tex.R. Civ. P. 279.

In this case, the jury made no findings in support of any element of appellee's declaratory judgment claim, and lack of

reasonable compensation was not conclusively established because the food and beverage credits themselves constituted some evidence of reasonable compensation. Accordingly, appellee waived his declaratory judgment claim. *See id.; Indigo Oil,* 1998 WL 839591, at *17. We sustain appellants' issue 1(c).

■ When reversal of a declaratory judgment is warranted, we render judgment unless remand is necessary for further proceedings. *Truck Ins. Exchange v. Musick,* 902 S.W.2d 68, 70 (Tex.App.-Fort Worth 1995, writ denied) (citing *Lone Star Gas Co. v. RR Comm'n,* 767 S.W.2d 709, 710 (Tex.1989) (per curiam)). In this case, the jury's answer to Jury Question 5 resolved appellants' request for declaratory judgment against them, as well as their claim against appellee for recovery of unpaid food and beverage charges, which was dependent on their prevailing on their declaratory judgment claims. Appellee's failure to obtain a jury finding supporting any element of his claims for declaratory judgment waived those claims.

We conclude the trial court erred in rendering declaratory judgment for appellee, and we render judgment that appellee take nothing on his requests for declaratory judgment. Because appellee's application for permanent injunction was dependent on his prevailing on his claims for declaratory judgment, we also render judgment denying his application for permanent injunction. We further conclude that the trial court did not err in ordering appellants take nothing on their claims for declaratory judgment and recovery of unpaid food and beverage charges.

Because of our resolution of issues 1(c), 2, and 3, we need not address appellants' issue 1(b) asserting the trial court erred in submitting Jury Question 5 because it was not supported by appellee's live pleading

and because it was immaterial and irrelevant.

### Attorney's Fees

■ In the sixth issue, appellants assert the trial court erred in awarding appellee his attorney's fees. The trial court awarded appellee his attorney's fees under section 37.009 of the Texas Civil Practice & Remedies Code, which provides: "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM.CODE ANN. § 37.009 (West 2008). In this case, the record does not show the reason for the trial court's decision to award attorney's fees. Having reversed the award of declaratory judgment to appellee, we reverse the award of attorney's fees. On remand, the trial court may consider whether an award of reasonable and necessary attorney's fees to either side is equitable and just. *See Hartsell v. Town of Talty,* 130 S.W.3d 325, 329 (Tex.App.-Dallas 2004, pet. denied); *id.* at 330 (op. on motions for reh'g). We sustain appellants' sixth issue.

Having reversed the award of attorney's fees, we need not consider appellants' seventh issue, which asserts the trial court erred in awarding postjudgment interest on the attorney's fees.

### BUSINESS DISPARAGEMENT

In their fourth issue, appellants contend the trial court erred in entering judgment on the jury's finding that appellee did not "disparage the business of Double Diamond." Appellants assert the evidence conclusively established as a matter of law that Saturn disparaged Double Diamond. In the alternative, appellants argue that the jury's finding was against the great weight and preponderance of the evidence.

■ The trial court instructed the jury on business disparagement as follows: [4]

A person disparages the business of another if he publishes a disparaging false statement about the business, and (1) the publication played a substantial part in inducing others not to do business with Double Diamond, which resulted in a specific pecuniary loss to Double Diamond, and (2) when he published the statement, he *either* knew the falsity of the statement, acted with reckless disregard as to whether the statement was false, acted with ill will, *or* intended to interfere with the economic interest of Double Diamond.

A statement is "disparaging" if it is understood to cast doubt upon the quality of another's land, chattels, or intangible things, or upon the existence or extent or Double Diamond's interest in them, and (2)[sic] Daniel Saturn intended the words to cast doubt, or the person receiving the statement could reasonably understand the statement to cast doubt.

A statement is "published" if it is intentionally communicated to a person other than Double Diamond who is capable of understanding its meaning.

*See Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 766 (Tex.1987); *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.-Dallas 2003, no pet); RESTATEMENT (SECOND) OF TORTS § 629, 630 (1977). In a business disparagement case, the plaintiff has the burden of proving special damages, that is, to "establish pecuniary loss that has been realized or liquidated as in the case of specific lost sales." *Hurlbut,* 749 S.W.2d at 767 (quoting W. PAGE KEETON, PROSSER & KEETON ON THE LAW OF TORTS, § 128 at 971 (5th ed. 1984)).

■ The trial court instructed the jury to consider only six exhibits in determining whether appellee disparaged Double Diamond's business. Five of these six exhibits were emails from appellee to another member. The sixth exhibit was an email from appellee to an unknown number of recipients, but it may have been sent to about 350 people.[5] Appellants did not call the recipients of any of these emails to testify, and appellants did not present any evidence that Double Diamond lost a sale or trade as a result of these emails. Accordingly, appellants did not conclusively establish that appellee's publication of the allegedly disparaging statements "resulted in a specific pecuniary loss to Double Diamond." Likewise, the jury's determination that appellee did not "disparage the business of Double Diamond" under the instructions in the jury charge was not against the great weight and preponderance of the evidence. We overrule appellants' fourth issue.

■ In their fifth issue, appellants contend the trial court erred in not submitting to the jury all the disparaging statements supported by the evidence. Appellants state the trial court excluded from the jury's consideration exhibits containing disparaging statements, namely, plaintiffs' exhibits 104, 105, 122, 123A, and 123E, and they assert the jury should have been charged to consider these exhibits.

---

4. When the parties do not object to the charge, "it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence." *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000). In this case, neither party objected to the quoted portions of the charge.

5. Appellee testified he sent emails to everyone who responded positively to his letters. He then stated, "I sent a number of emails to about 350 people." Although no testimony shows how many people received this email, it may be one he sent to "about 350 people."

During trial, appellants objected to the omission of plaintiffs' exhibits 104, 122, 123A, and 123E from the business-disparagement question; however, appellants did not object to the omission of plaintiffs' exhibit 105. Accordingly, they have waived any error in its omission. *See* TEX.R. CIV. P. 274.

As for the remaining exhibits, the record does not show the trial court ruled on their objection. To preserve error for appellate review, a party must object to error and obtain an express or implicit ruling on the objection. TEX.R.APP. P. 33.1(a). In this case, appellants objected to the omission of plaintiffs' exhibits 104, 122, 123A, and 123E. However, before the court ruled on the objection, the discussion turned to appellants' request for the inclusion of additional exhibits not previously submitted to the trial court as disparaging. *See Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex.2000) (whether statement is capable of defamatory meaning "is initially a question for the court"). After lengthy discussion, appellants withdrew their request for the court to consider the additional items, but they did not remind the court of their pending objection to the omission of plaintiffs' exhibits 104, 122, 123A, and 123E, and the court did not expressly rule on the objection. Because of the intervening discussion about the additional exhibits and appellants' withdrawal of their request that the court consider them, we conclude the trial court's submission of the business-disparagement question without plaintiffs' exhibits 104, 122, 123A, and 123E did not constitute an implicit ruling on appellants' request for the inclusion of those exhibits. Accordingly, appellants have not preserved this complaint for appellate review. *See* TEX.R.APP. P. 33.1(a). We overrule appellants' fifth issue.

## CONCLUSION

We affirm the trial court's judgment that appellants take nothing on their claims against appellee, except for their claim for attorney's fees. In all other respects, we reverse the trial court's judgment, we render judgment (1) that appellee take nothing on his claims for declaratory judgment and (2) that his application for permanent injunction is denied, and we remand the cause to the trial court for further proceedings on the parties' claims for attorney's fees.