REVERSE, RENDER, AFFIRM; Opinion issued December 21, 2012.



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-10-01024-CV

## CONDOM SENSE, INC., MRSK, INC., MRK, INC., MKSK, LLC, MARSTEK, LLC, SKCMK, LLC, AND MSCK 121, LLC, Appellants

### V.

## JAMAL ALSHALABI A/K/A MIKE EDWARDS, GREG SMITH, MONSERRAT SMITH, J&J NO-LIMIT, INC., CONDOMS ETC., LLC, CONDOM SENSATION DALLAS LLC, CONDOM EXPRESS, LLC, AND COMOROS, LLC, Appellees

On Appeal from the County Court at Law No. 2
Dallas County, Texas
Trial Court Cause No. 06-17938-b

# OPINION

Before Justices Lang, Murphy, and Myers
Opinion By Justice Murphy

This multi-party dispute involves one federal and four Texas service mark registrations using the words "Condom Sense." Appellant Condom Sense, Inc. (CSI) is the named holder of those registrations. CSI and the additional appellants, who are individual management companies owning and operating Condom Sense retail stores in the Dallas area, sued appellees seeking damages and an injunction to prevent use of the marks. The trial court granted judgment for appellees, ordering the cancellation of the marks. This appeal followed. We reverse the judgment regarding cancellation of the four Texas service mark registrations but otherwise affirm the judgment.

# I. INTRODUCTION

Trademark infringement law is part of the broader law of unfair competition. *Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418, 428 (2003); *Union Nat'l Bank of Tex., Laredo, Tex. v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 843 n.10 (5th Cir. 1990). That law prohibits uses of trademarks, service marks, trade names, and trade dress that are likely to cause confusion as to the source of the product or service. *See Moseley*, 537 U.S. at 428. Infringement law serves two roles: one is to protect the consumer from being misled by the use of infringing marks; the other is to protect the investment in a mark made by the owner. *See Qualitex Co. v. Jacobson Prods., Co.*, 514 U.S. 159, 163–64 (1995); *Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 205 (1942) (noting infringement law recognizes the value of symbols; if one "poaches upon the commercial magnetism of the symbol" created by the owner, "the owner can obtain legal redress"); *see also King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1149 n.3 (S.D. Tex. 1982).

Appellants' claims are governed by the Trademark Act of 1946, also known as the Lanham Act, *see* 15 U.S.C.A. §§ 1051–1127 (West 2009), the Texas Trademark Act, *see* TEX. BUS. & COM. CODE ANN. §§ 16.01–.31 (West 2011),[1] and Texas common law. Congress enacted the Lanham Act to provide for national protection of marks used in interstate and foreign commerce. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 193 (1985). The Texas legislature similarly enacted legislation to confer statewide protection for the owner of a mark. *See* TEX. BUS. & COM. CODE ANN. § 16.15(b); *Hot-Hed, Inc. v. Safehouse Habitats (Scot.), Ltd.*, 333 S.W.3d 719, 730 (Tex.

---

[1] The Texas Trademark Act was recodified during the 2012 regular legislative session. The change in law, however, does not affect any suit, proceeding, or appeal pending on September 1, 2012, the effective date of the Act. *See* Acts of 2011, 82nd Leg., R.S., ch. 563, §§ 1, 4, 2011 Tex. Sess. Law Serv. 1368, 1377 (current version at TEX. BUS. & COM. CODE ANN. §§ 16.001–.107). We therefore will apply the former law in our discussion and analysis.

App.—Houston [1st Dist.] 2010, pet. denied). The Texas Trademark Act was derived from the Model State Trademark Bill drafted by the United States Trademark Association in 1949, which was revised in 1964 and 1992. *See Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1081 (5th Cir. 1997). And the Texas common law elements of unfair competition, including trademark, "are no different than those under federal trademark law." *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.); *see also Hot-Hed, Inc.*, 333 S.W.3d at 730; *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied); *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ). Courts therefore look to the Lanham Act and cases thereunder for generally accepted principles of substantive trademark law and to discern meaning and interpretation of the state law provisions. *See KLN Steel Prods. Co. v. CNA Ins. Cos.*, 278 S.W.3d 429, 440–41 (Tex. App.—San Antonio 2008, pet. denied).[2]

Although often used interchangeably, the words trademark, service mark, and trade name have different meanings. *See Am. Legion v. Matthew*, 144 F.3d 498, 499 (7th Cir. 1998) (noting "[m]ost of the time 'trademark' and 'trade name' operate as synonyms"). A trademark is a designation, including any word, name, symbol, or device, used by a person to identify his goods and distinguish them from goods produced by another. 15 U.S.C.A. § 1127; TEX. BUS. & COM. CODE ANN. § 16.01(a)(5); *Blue Bell, Inc. v. Farah Mfg. Co.*, 508 F.2d 1260, 1264 (5th Cir. 1975). A service mark is essentially a trademark that is used in connection with services; it is a designation used by a person to identify his services and distinguish them from the services of another. 15

___

[2] The proposition that Texas courts should look to federal cases for guidance also is evidenced in the recodified version of the Texas Trademark Act. The stated intent of the recodified version was to bring Texas trademark laws "into alignment with federal trademark infringement and dilution laws, as contained in the model legislation." House Comm. on Business & Industry, Bill Analysis, 82nd Leg., R.S. (2011). To that end, the construction given to the Lanham Act "should be examined as persuasive authority for interpreting and construing" the Texas Act. Acts of 2011, 82nd Leg., R.S., ch. 563, § 3, 2011 Tex. Sess. Law Serv. 1377.

U.S.C.A. § 1127; Tex. Bus. & Com. Code Ann. § 16.01(a)(4). Trademarks and service marks are separately defined in the applicable statutes, but their definitions closely track each other, and they are governed by identical standards. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 236 n.10 (5th Cir. 2010); *see also* Restatement (Third) of Unfair Competition § 9 cmt. f (1995); 1 McCarthy on Trademarks § 4:14, at 4–16 ("For all practical purposes, both trademarks and service marks are subject to the same substantive rules of validity and infringement."); *cf.* 15 U.S.C.A. § 1053 ("service marks shall be registrable, in the same manner and with the same effect as are trademarks, and when registered they shall be entitled to the protection provided in this chapter in the case of trademarks"). The term "mark" includes any trademark or service mark. 15 U.S.C.A. § 1127; Tex. Bus. & Com. Code Ann. § 16.01(a)(2).

A trade name is any designation adopted and used by a person to identify his business; it represents the goodwill that has been built over time by the user. 15 U.S.C.A. § 1127; Tex. Bus. & Com. Code Ann. § 16.01(a)(6); *Thompson v. Thompson Air Conditioning & Heating, Inc.*, 884 S.W.2d 555, 558 (Tex. App.—Texarkana 1994, no pet.). Unlike trademarks or service marks, which are used to identify and distinguish the goods or services provided, a trade name is used to identify and distinguish the business itself from other entities. *See* 15 U.S.C.A. § 1127.

A registered mark is one that has been registered in the United States Patent and Trademark Office (USPTO) or in the office of the secretary of state of Texas; trade names are not subject to registration, unless they also are used as marks. *See* 15 U.S.C.A. § 1127; Tex. Bus. & Com. Code Ann. §§ 16.08(c), 16.10. Rights in a mark, however, grow out of *use* of the mark in commerce, not from mere registration. *See Union Nat'l Bank of Tex., Laredo*, 909 F.2d at 842; *Blue Bell, Inc.*, 508 F.2d at 1265; *cf.* 15 U.S.C.A. § 1127 (use of mark means "bona fide use of such mark"). Those rights are retained for as long as the use of the mark continues, or as long as nonuse of the mark is

-4-

suitably explained. *See* 15 U.S.C.A. § 1058. Like other rights that depend upon use, rights in a mark may be lost by abandonment, laches, or acquiescence. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 418–19 (1916), *superseded by statute as stated in Park 'N Fly, Inc.*, 469 U.S. at 200.

## II. FACTUAL BACKGROUND

### A. The "Condom Sense" Service Marks

The primary service mark at issue in this case is "Condom Sense," which is presented with and without a circle design. When used, the circle is positioned around the two words and is said to represent a condom.

The Condom Sense mark was first registered as a trademark in 1989 by a company called Ansell Incorporated, later renamed Ansell Healthcare Products, LLC. Ansell manufactures latex products, including condoms, and it registered the trademark "Condom Sense" with the USPTO for use in class 10 prophylactics. Ansell used the trademark on packaging for its Lifestyle brand condoms with the tagline: "LIFESTYLES . . . It's a Matter of Condom Sense!"

In August 1992, Ansell filed an intent-to-use application,[3] seeking federal registration of the mark as a service mark for use in class 42, retail store services. At that time, Ansell did not have a retail storefront or otherwise use the mark in connection with retail store services. But in its application, it stated a bona-fide intention to do so. Ansell received notice that the Condom Sense service mark was allowed for registration by the USPTO in mid-1994. The USPTO registered the mark to Ansell on June 13, 1995. In 2005, Ansell assigned its entire interest and goodwill in the class 42 mark to appellant CSI. That assignment and the surrounding events will be described in more detail below.

---

[3] The "intent-to-use" provision of the Lanham Act allows an applicant to seek registration without using a mark in commerce so long as the applicant has "a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce . . . ." 15 U.S.C.A. § 1051(b)(1). Once a "notice of allowance" for the mark is issued, the applicant has six months to use that mark in commerce. *Id.* § 1051(d)(1).

After acquiring the federal registration of the Condom Sense mark by assignment, CSI then registered that mark with and without the circle design in Texas. It also registered two additional marks in Texas: (1) the phrase "Condom Sense Est. 1990" with a circle design and (2) the phrase "Condom Sense Stores" with the circle design. In all, CSI registered four services marks in Texas, each dated April 19, 2007.

## B. The Parties

The parties are competitors in the adult novelty and gift industry and use the service marks in connection with their retail stores. The parties also identify their stores by the name "Condom Sense" featuring the circle design.

### 1. Appellants

Appellant CSI is a Texas corporation that holds the federal and state registrations for the Condom Sense mark, as well as the additional state-registered marks. The remaining appellants are individual management companies that own and operate six Condom Sense retail stores in Dallas and the surrounding areas.[4] The entities that operate the retail stores claim the right to use the Condom Sense service marks and name through CSI.

The principals affiliated with appellants are Steven Kahn (Kahn) and his mother, Marcia Kahn (Marcia). According to Kahn, he developed the concept of the circle design around the words "Condom Sense," and he used that concept in connection with the first Condom Sense store he opened in 1992. That store was located at 3609 Greenville Avenue in Dallas. Kahn operated that location through his management company SKCS Rubber, Inc., which is not a party to the lawsuit or this appeal. Kahn sold condom-related items as well as provided literature about condom usage

---

[4] Each appellant operates one Condom Sense location. The distinction among appellants concerning which entity operates which Condom Sense retail location, however, is immaterial to our analysis.

and sexually transmitted diseases. Kahn touted this store as being the first store of its kind in Dallas. The Internet domain names www.condomsense.com and www.condomsensestores.com are affiliated with the Kahns' retail locations.

## 2. Appellees

Appellee Mike Edwards, formerly known as Jamal Alshalabi, is the principal affiliated with appellee J&J No-Limit, Inc., a Texas corporation established in January 2001. At the time the lawsuit was filed, Edwards, through J&J No-Limit, operated one Condom Sense store. Appellees Greg and Monserrat Smith are the principals affiliated with the remaining appellees, which are individual entities that own and operate multiple Condom Sense locations.[5] Although Monserrat Smith shares ownership of the operating companies with her husband, she does not participate in running the stores. Greg Smith bought the couple's first Condom Sense store from Edwards in 2004. In addition to adult novelties and other gifts, the stores operated by appellees also sell drug paraphernalia and smoking supplies. Appellees claim they received their right to use the Condom Sense mark at any location through a purchase and sale agreement between Edwards and SKCS Rubber in 1997. That agreement will be discussed in more detail below.

Appellees have several domain names containing the words "Condom Sense" that all link to one website. The website was created by Greg Smith, who also is responsible for the website's content.

## C. The License Agreement Between Ansell and CSI

In early 1992, Ansell became aware of Kahn's use of Ansell's federally registered service mark in connection with the 3609 Greenville store and notified Kahn that it considered such use to

---

[5] Like the appellant entities, each of the remaining appellee entities owned by the Smiths operate one Condom Sense store. Again, the distinction of which entity operates which Condom Sense location has no effect on our analysis.

be unauthorized. Kahn responded by offering to purchase the mark. Rather than sell the mark to Kahn, Ansell agreed to grant Kahn limited rights to use its mark through a license agreement.

Negotiations between Ansell and Kahn over the terms of the license agreement began some time in 1992 and continued through early 1994, with Ansell repeatedly communicating to Kahn its desire to finalize the agreement. Ansell considered the license agreement to be a "high priority" and "critical" for the protection of its mark. After informing Kahn in March 1994 that Ansell would stop Kahn's unauthorized use of its mark if negotiations were not concluded, Ansell and CSI finally entered into a license agreement, dated April 1, 1994; Kahn signed the agreement as president of CSI.

Under the terms of the license agreement, Ansell granted CSI a limited right to use the Condom Sense mark in connection with the retail sale of condoms and related goods. In exchange for the right to use the mark, CSI was required to pay Ansell royalties calculated at one percent of gross sales (less sales tax) on a quarterly basis. The license granted to CSI was not automatically renewable. Rather, the license was for a period of five years with the option to renew for an additional five-year period if CSI gave written notice of its intent to renew sixty days before the agreement expired and was not in default under any term or condition of the agreement. If CSI did not exercise its option to renew, the agreement would expire at the end of the five-year term. Any modifications or amendments to the agreement were required to be in writing.

Based on Ansell's dealings with the Kahns during the negotiations period, Ansell limited CSI's rights to use the Condom Sense mark in several respects. For example, CSI could use the mark only at "not more than two (2) retail locations" within the Dallas metropolitan area.[6] The

---

[6] In 1993, while negotiations with Ansell were ongoing, the Kahns opened a second Condom Sense store in Dallas, which was owned and operated by Marcia. That store used the Condom Sense mark.

agreement also was non-assignable and did not contain any clause permitting CSI to grant sublicenses for use of the Condom Sense mark or trade name. In addition, Ansell could revoke CSI's license upon written notice if, among other things, CSI did not pay royalties or breached any provision of the agreement and failed to cure the breach.

The license agreement emphasized that Ansell held the exclusive right, title, and interest in and to the mark and the goodwill associated with the mark belonged solely to Ansell. CSI was prohibited under the agreement from representing it had ownership in the mark. Rather, CSI's use of the mark expressly inured to the benefit of Ansell. CSI also was prohibited from contacting any third party, making demands or claims, instituting a suit, or taking any other action related to infringing or improper use of the mark without first obtaining written consent from Ansell. The right to take action against any infringing or improper use remained with Ansell. CSI was required to notify Ansell in writing of any activity that constituted infringement or improper use of Ansell's mark.

Kahn did not make the first royalty payment due just after the license agreement was signed. And according to Ansell's former trademark administrator, Laura Gier, she had to "hound" the Kahns on several occasions because both Kahn and Marcia were delinquent in making the required royalty payments for both stores. Despite receiving continued demands for payment from Ansell, the Kahns did not pay any royalties after the third quarter of 1996. Kahn agreed he ceased paying royalties at some point but claimed he reached an agreement with Ansell that he no longer had to pay royalties because he was such a large purchaser of Ansell's products. Gier was unaware of any agreement with the Kahns to waive the requirement to make royalty payments and stated any such arrangement would have been in writing. Ansell never sued CSI or the Kahns to collect past due royalties.

Ansell's only use of the mark in commerce in connection with retail store services was CSI's authorized use under the license agreement. In its verified statement of use filed with the USPTO following the June 1994 notice of allowance, Ansell listed the date of the license agreement, April 1, 1994, as the date of Ansell's first use of the mark in commerce in retail store services. Although Ansell made attempts to license the mark to others, it was unable to secure another licensee. CSI was the only licensed user of the mark. And from the time Ansell registered the Condom Sense mark for use in retail store services until the time it assigned the mark to CSI in 2005, Ansell never directly used the class 42 mark in commerce. In January 2001, Ansell filed a declaration of continued use with the USPTO, stating the service mark had been in continuous use in retail store services for the preceding five years and was still in use.

**D. Sale of the 3609 Greenville Location to Edwards**

In 1997, Kahn, through SKCS Rubber, sold to Edwards the Condom Sense store located at 3609 Greenville. The sale was memorialized in a purchase and sale agreement, dated August 20, 1997 (the 1997 agreement). Kahn signed the 1997 agreement as SKCS Rubber's president.

In the "Recital" portion of the agreement, the parties described the reason for the agreement as follows:

> [Edwards] desires to purchase and [SKCS Rubber] desires to sell, as a going concern, the leasehold, improvements, inventory and goodwill, as well as the non-exclusive right to use of the name, of "Condom Sense" a Dallas Retail establishment, located at 3609 Greenville Avenue, Dallas, TX 75206.

The parties then detailed the subject matter of the sale under the "Purchase and Sale" heading:

> [Edwards] shall purchase from [SKCS Rubber] on the terms and conditions set forth in this Agreement:
>
> a) All the stock in trade merchandise of said business;
>
> b) All the fixtures, equipment and other tangible assets of said business as

shown on the inventory attached hereto as Exhibit "A" and incorporated herein by reference for all purposes;

c) All the trade, goodwill, and other intangible assets of said business, including the non-exclusive right to use of the trade name, Condom Sense.

The "right to use of the trade name" was a "non-exclusive right" because Marcia continued to operate the Condom Sense store she owned at a different location. The 1997 agreement provided further that it was binding on Edwards's heirs, successors, and assigns.

Edwards paid $60,000 for "all the properties, assets, and rights" of the business, with approximately $15,500 of the purchase price representing the store's inventory. Edwards considered the right to use of the Condom Sense name to be about seventy-five percent of what he purchased because he did not plan to operate a store at the 3609 Greenville location in the future. Edwards financed a portion of the purchase price through a promissory note, which he paid in full by September 1998.

The license agreement between Ansell and CSI was in effect at the time of the sale, but the 1997 agreement contains no reference to Ansell or CSI's limited rights under the license agreement. Nor does the 1997 agreement mention any obligation to pay royalties to Ansell. SKCS Rubber expressly warranted it owed no obligation and had contracted no liabilities related to the business, which would affect the consummation of the purchase and sale.

Edwards owned and operated the Condom Sense store at 3609 Greenville until March of 1999 when he sold the business to another individual, who is not a party to the lawsuit. That purchase and sale included the inventory, office equipment, fixtures, and other related assets used in the business. The agreement for this purchase and sale did not mention any intangible assets of the business, such as any right to use of the name Condom Sense. But according to Edwards, he sold the new owner what was sold to him: the physical assets and inventory related to the store and the

–11–

right to use the name. The new owner later closed the 3609 Greenville store.

**E. Disagreement Over the Scope of the 1997 Agreement's "Right to Use" Provision**

Between 2000 and 2008, the Kahns opened six new Condom Sense stores in and around Dallas, with one of those stores later closing. In 2001, Edwards also opened a new Condom Sense store in Deep Ellum, a neighborhood located near downtown Dallas. The Deep Ellum location was operated by J&J No-Limit.

The Kahns took the position that the opening of the Deep Ellum store constituted infringement of their service mark and name. On October 11, 2001, their lawyer sent Edwards a letter demanding Edwards discontinue using the Condom Sense mark and name at the Deep Ellum store. Specifically, the Kahns' lawyer advised Edwards that since December 1991, the Kahns "have become the exclusive owner of the Condom Sense trade name for novelty stores." And based on the "substantial goodwill" the Kahns had built in the mark, they "must enforce their rights" in the mark and name. They gave Edwards four days to provide written assurances that he would discontinue use; they threatened to enforce their rights in court if he did not comply.

Contrary to the Kahns' position, Edwards believed he purchased the "non-exclusive right to use" of the name "Condom Sense" and any associated marks when he entered into the 1997 agreement and paid $60,000. He also believed he retained the right to use the name and open additional stores even after he sold the store at 3609 Greenville.

After receiving the October 2001 letter, Edwards spoke with Maria Ramos, a friend and paralegal. Ramos reviewed the letter and the 1997 agreement and then contacted the Kahns' lawyer. She notified the lawyer that Edwards's interpretation of the 1997 agreement differed from the Kahns' interpretation—that is, Edwards believed the right to use the mark and name was not limited to the one store located at 3609 Greenville. The lawyer responded on October 16, 2001 by forwarding

Ramos copies of Assumed Name Certificates filed by Kahn in 1991 and 2001. He also informed her that it was his "understanding that [Edwards] purchased the right to use the name 'Condom Sense' at the store located at 3609 Greenville only." Edwards failed to comply with the demand, and no legal action was commenced at that time.

Thereafter, in 2003, Edwards opened another Condom Sense store on Cedar Springs Road. This prompted the Kahns' lawyer to send a second cease and desist letter, dated March 6, 2003. In this letter, the lawyer advised Edwards he was retained to resolve Edwards's "unauthorized use of [the Kahns'] brand name." The letter set a deadline of thirty days to address the problems and again threatened to "expedite legal proceedings" if Edwards failed to comply.

The lawyer also attached a "detailed description of the problem" in which he described (1) Kahn's concept and development of the "brand" (which was a combination of the name Condom Sense, logo, and popularity of Kahn's "pioneering concept"), (2) the sale of 3609 Greenville and "limited" right to use of the name, and (3) claims that Edwards "seriously harmed" the "brand." In the attachment, the lawyer explained that Kahn sold the 3609 Greenville location because the location was too small to support what Kahn thought this type of adult novelty store should offer its clients. He continued: "[Kahn] sold [Edwards] this store with the expressed understanding between [the] parties, established through many meetings" that Edwards "would only use the BRAND at that location" and Kahn "would continue to open up new stores under [the] BRAND" in Dallas.

The lawyer claimed in the attachment that within a year of the sale, Edwards harmed the Condom Sense name by failing to pay vendors, which affected Kahn's ability to open new stores, and by stocking and advertising drug paraphernalia. The lawyer also claimed that after closing the founding store on Greenville, Edwards "surreptitiously began operating new stores in other locations using the BRAND to which [Edwards] only had a limited right of use for the original location."

In December 2003, CSI, SKCS Rubber, and the Kahns filed suit against Edwards and J&J No-Limit, asserting Edwards had breached the 1997 agreement and asking that Edwards cease using the "trade name 'Condom Sense' at all locations where [Edwards/J&J No-Limit] have opened such businesses." They also asked that Edwards be enjoined from opening additional stores under the name Condom Sense. The Kahns did not notify Ansell of Edwards's alleged infringing or improper use of the Condom Sense mark before they sent the cease-and-desist letters or filed the lawsuit.

## F. The Smiths Purchase Two Condom Sense Locations from Edwards

While the lawsuit was pending, Edwards and J&J No-Limit sold the Deep Ellum and Cedar Springs locations to appellees Condoms Etc., LLC and Condom Sensation Dallas, LLC, two entities affiliated with the Smiths. Greg Smith signed the Asset Purchase Agreement, dated January 1, 2004, as president of those entities.

Smith's companies paid $300,000 for "all of the assets of the two retail stores doing business as Condom Sense," which included the fixed assets in each store as well as Edwards's "right, title, and interest in and to the trade name Condom Sense and any names derived from or bearing a resemblance thereto and any related trademarks, trade names, service marks and other trade rights . . . ." The purchase agreement specifically provided that:

> [J&J No-Limit] owns or releases or otherwise possesses a transferable right to use all assets used in the conduct of the Business as conducted immediately before the date of this Agreement. For the buyer to enjoy the use of the trade name "Condom Sense," [J&J No-Limit] agrees and hereby assigns to the extent necessary the Agreement of August 20, 1997 between [Edwards] and SKCS Rubber, Inc.

Although the agreement referenced the lawsuit filed by the Kahns, it affirmatively stated the "use of the name Condom Sense does not infringe the rights of any third party." Smith believed there was nothing in the 1997 agreement that prohibited or limited the ability to expand the business.

After purchasing the Deep Ellum and Cedar Springs locations, the Smiths opened a new Condom Sense store at 2017 Greenville, which later closed due to fire damage. They also changed the name of another adult novelty store they owned at 3615 Greenville from "Red Hot Funwear" to Condom Sense. In 2004 or 2005, Edwards and Smith also opened an adult novelty store on Preston Road called "Behind Closed Doors." They changed the name of the Preston Road store to Condom Sense after operating under the former name for one year. The Deep Ellum store later closed its doors.

## G. Ansell's Assignment of the Mark

In May 2001, Ansell hired Geralyn Monroe as its Global Intellectual Property Manager. Monroe was responsible for managing Ansell's trademark portfolio, which consisted of approximately 6500 registered marks. According to Monroe, Ansell did not have anyone in the position of trademark administrator from the time Gier left in 1996 until the time Monroe was hired in 2001.

When Monroe first started, she was not aware of Ansell's license agreement with CSI. But in November 2004, she received a letter from the Kahns' lawyer informing her of the lawsuit the Kahns had filed against Edwards and J&J No-Limit and attaching documents related to the sale of the 3609 Greenville location to Edwards. After speaking with the Kahns' lawyer, she pulled the files related to the license agreement from Ansell's archives. In those files, Monroe found no correspondence from Kahn about the sale of the 3609 Greenville location to Edwards in 1997. Rather, the November 2004 letter was the first correspondence Ansell received about that sale. Monroe did not find any approval from Ansell that would have allowed Kahn to sell or assign the non-exclusive right to use the mark.

The first time Edwards became aware of Ansell was in December 2004 when he received a letter signed by Monroe on behalf of Ansell informing him of Ansell's registration and use of the Condom Sense mark in connection with retail store services. Monroe advised Edwards that Ansell considered his use of the mark to constitute infringement and demanded that Edwards immediately stop all use. Ansell sent a second cease and desist letter to Edwards on January 12, 2005.

Around that same time, both Kahn and Edwards expressed interest in acquiring the federal class 42 service mark from Ansell. Monroe characterized the decision to sell the mark as a "no brainer" because Ansell was not using the mark; it was "either sell it or let it go." Ansell ultimately sold the mark to CSI for $4,000.

The sale of the mark to CSI was memorialized in an "Assignment of Trademark" dated February 2, 2005, which was filed with the USPTO. Pursuant to the terms of the assignment, CSI acquired all of Ansell's "rights, title, and interest in and to the Mark, together with all of the goodwill of the businesses and business concepts symbolized thereby, as well as the registration and other rights, including common law rights," Ansell may have related to the mark. CSI also acquired Ansell's "claims for damages for reason of past infringement" of the mark and the "right to sue for and collect the same for its own use and enjoyment."

Within days of the Ansell assignment, CSI, SKCS Rubber, and the Kahns filed a motion for voluntary nonsuit of their action against Edwards and J&J No-Limit. The trial court signed the order granting the motion on February 8, 2005.

## H. Appellants File This Lawsuit

Nearly two years after the 2003 lawsuit was nonsuited, appellants filed their original petition and application for temporary restraining order and temporary and permanent injunctions against appellees, alleging claims for trademark infringement under the Lanham Act and Texas common

law, cyberpiracy under the Lanham Act, unfair competition under the Lanham Act and Texas common law, and trademark dilution under the Lanham Act. Appellants sought damages and an order enjoining and restraining appellees from using the name Condom Sense to identify appellees' businesses or the Condom Sense mark in connection with appellees' products or services. Appellants also asked for an order requiring appellees to transfer their registrations of appellees' domain names to appellants. The trial court denied appellants' application for temporary injunction on March 1, 2007.

After the lawsuit was filed, CSI filed its applications for state registration of the four service marks. Thereafter, in their amended pleadings, appellants added claims for infringement under the Texas Trademark Act based on the four service marks CSI registered with the state. Appellants' third amended petition and application for permanent injunction, filed February 24, 2009, was the live pleading at the time of trial. They nonsuited their dilution cause of action before trial.

Appellees generally denied appellants' allegations and asserted various affirmative defenses, including acquiescence, estoppel, laches, limitations, unclean hands, abandonment, and fraud. Appellees also alleged the 1997 agreement, which was attached to appellants' petition, was ambiguous. By counterclaim, appellees sought cancellation of CSI's state and federal registrations: (1) for the four Texas marks because CSI engaged in fraudulent conduct in the procurement of those marks, and (2) for the federal mark because that mark was abandoned before it was assigned to CSI and because it was fraudulently procured. Appellees asked for costs and attorney's fees incurred in canceling the service mark registrations.

The case was tried to the bench, and the trial court rendered judgment in favor of appellees. Specifically, the trial court determined (1) appellants failed to establish their causes of action for infringement, unfair competition, and cyberpiracy; (2) the 1997 agreement provided appellees with

consent for use of the mark; (3) Ansell was not using the mark at the time it submitted its 2001 declaration of continued use; (4) the federally registered mark had been abandoned no later than May 2004; and (5) when CSI submitted its state registrations, it failed to disclose on the application appellees' claim of a right to use the marks in Texas. The trial court's May 17, 2010 final judgment ordered that appellants take nothing on their claims against appellees. The court also ordered the cancellation of the federal service mark registration under 15 U.S.C.A. § 1119 and the four Texas mark registrations under TEX. BUS. & COM. CODE ANN. § 16.28(b)(2). The trial court's findings of fact and conclusions of law in support of its judgment consisted of 108 factual findings and forty legal conclusions. This appeal followed.

## III. DISCUSSION

Appellants raise six issues on appeal in which they ask this Court to reverse the trial court's judgment and remand the case for an award of damages and the granting of an injunction to prevent appellees' continuing infringement and improper use related to the marks. Appellants' first and second issues relate to appellees' counterclaims. They assert the trial court abused its discretion when it cancelled the registrations of CSI's state and federal service marks. In their third issue, appellants contend the trial court abused its discretion when it rendered judgment against them on their claims for infringement and unfair competition because appellants presented evidence that appellees' use of the Condom Sense mark was without CSI's or Ansell's permission and confused the public. They also contend in their fourth issue that the trial court abused its discretion by finding appellants did not present sufficient evidence to establish their cause of action for cyberpiracy.[7]

---

[7]The Anti-Cybersquatting Consumer Protection Act seeks to prevent cyberpiracy, also commonly referred to as cybersquatting. *See* 15 U.S.C.A. § 1125(d). Cybersquatters are those who register domain names of well-known trademarks and then try to profit from the marks. *See Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001). Acts of cyberpiracy or cybersquatting generally refer to the "deliberate, bad-faith, and abusive registration of Internet domain names in violation of the rights of trademark owners." *Id.* (internal quotations omitted).

Appellants assert in their fifth and sixth issues that the trial court abused its discretion when it concluded their causes of action were barred by laches, acquiescence, unclean hands, and other equitable defenses (issue five) as well as the statute of limitations (issue six) because appellees failed to present any evidence to support these defenses.

## A. Standard of Review

We apply an abuse of discretion standard of review to resolve the issues presented in this case. *See, e.g., Patsy's Italian Rest., Inc. v. Banas*, 658 F.3d 254, 264 (2d Cir. 2011) (trial court's decision to order cancellation of registered mark); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1082 & n.16 (5th Cir. 1997) (court's decision on laches). Under this standard, we look to whether the trial court acted unreasonably; that is, did the trial court act in an arbitrary manner or without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). With respect to factual matters, a trial court abuses its discretion if, under the record, it reasonably could have reached only one decision and failed to do so. *Moroch v. Collins*, 174 S.W.3d 849, 864 (Tex. App.—Dallas 2005, pet. denied). A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *See id.* at 857; *see also All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 487 (Tex. App.—Fort Worth 1999, no pet.) (no abuse of discretion if court makes decision based on conflicting evidence and some evidence supports the court's determination). Because a trial court has no discretion in determining what the law is or applying the law to the facts, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding).

A trial court's fact findings are reviewable for legal and factual sufficiency of the evidence by the same standards we apply in reviewing the evidence supporting a jury's answer. *Moroch*, 174 S.W.3d at 857. Under an abuse of discretion standard, legal and factual sufficiency grounds constitute factors in which we may gauge whether the trial court abused its discretion. *Id.*; *Beaumont Bank, N.A. v. Buller*, 806 S.W.2d 223, 226 (Tex. 1991); *All Am. Builders, Inc.*, 991 S.W.2d at 487 ("Legal and factual sufficiency challenges are not independent grounds for reversal, but are factors to be considered in assessing whether the court has abused its discretion."). In determining whether a trial court abused its discretion because the evidence is legally or factually insufficient to support the decision, we first look to whether the trial court had sufficient evidence upon which to exercise its discretion and then look to whether the trial court erred in its application of that discretion. *Moroch*, 174 S.W.3d at 857. Under the second step, our inquiry is based on the elicited evidence; we ask: Did the trial court make a reasonable decision? *Id.*

"When an appellant attacks the legal sufficiency of the evidence to support an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding." *Hoss v. Alardin*, 338 S.W.3d 635, 640 (Tex. App.—Dallas 2011, no pet.). In conducting our review, we look at all the evidence, in the light most favorable to the judgment, to determine whether the fact finder could reasonably have formed a firm belief or conviction that the finding was true. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). Evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

We are mindful in a sufficiency review that the fact finder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819; *Double Diamond, Inc. v. Saturn*, 339 S.W.3d 337, 344 (Tex. App.—Dallas 2011, pet. denied). We may not substitute our

judgment for the fact finder's, even if we would reach a different answer on the evidence. *Double Diamond, Inc.*, 339 S.W.3d at 344.

A trial court's conclusions of law are not binding on this Court; rather, we are free to draw our own legal conclusions. *Harlingen Irrigation Dist. Cameron Cnty. No. 1 v. Caprock Commc'ns Corp.*, 49 S.W.3d 520, 530 (Tex. App.—Corpus Christi 2001, pet. denied). We conduct a de novo review of a trial court's legal conclusions, determining whether the trial court correctly drew the legal conclusions from the facts. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.—Dallas 2005, pet. denied). And we will uphold the trial court's legal conclusions if the judgment can be sustained on any legal theory supported by the evidence. *See BMC Software*, 83 S.W.3d at 794; *Young v. Gumfory*, 322 S.W.3d 731, 741 (Tex. App.—Dallas 2010, no pet.). A trial court's conclusions of law may not be challenged for factual sufficiency and will not be reversed unless they are erroneous as a matter of law. *Stable Energy, L.P. v. Newberry*, 999 S.W.2d 538, 547 (Tex. App.—Austin 1999, pet. denied). Incorrect legal conclusions "will not require reversal if the controlling findings of fact will support a correct legal theory." *Id.*; *see also Wells Fargo Bank, Nw., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 706 n.5 (Tex. App.—Dallas 2012, no pet.).

### B. Counterclaims: Cancellation of State and Federal Service Mark Registrations

Appellants challenge the trial court's cancellation of CSI's state and federal service mark registrations in their first two issues. Under both the Lanham Act and the Texas Trademark Act, courts have the power to order the cancellation of service mark registrations. *See* 15 U.S.C.A. § 1119; TEX. BUS. & COM. CODE ANN. § 16.16(a)(4); *see also Cent. Mfg., Inc. v. Brett*, 492 F.3d 876, 883 (7th Cir. 2007) (section 1119 "arms the court with the power to update the federal trademark register to account for a mark's actual legal status (or lack thereof) after it has been adjudicated");

*King-Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F. Supp. 1138, 1167–68 (S.D. Tex. 1982). The Lanham Act and the Texas Trademark Act both list several grounds that may support cancellation of a registration. *See* 15 U.S.C.A. § 1064; TEX. BUS. & COM. CODE ANN. § 16.16(a)(4). For example, a registration may be cancelled if the registered mark "has been abandoned," 15 U.S.C.A. § 1064(3); TEX. BUS. & COM. CODE ANN. § 16.16(a)(4)(A), or "was obtained fraudulently." 15 U.S.C.A. § 1064(3); TEX. BUS. & COM. CODE ANN. § 16.16(a)(4)(D).

### 1. Issue One: Cancellation of the Four Texas Service Mark Registrations

Appellees pleaded that each of the four Texas mark registrations should be cancelled because CSI obtained the state registrations by fraud in violation of section 16.28 of the Texas Business and Commerce Code. They alleged the fraud related to statements CSI had made on each application for registration that "no other person is entitled to use the mark" despite the fact that CSI was in litigation with appellees over appellees' use of the marks. At trial, appellants stipulated that "[a]t no time during the process of seeking the Texas marks, did [appellants] disclose to the State of Texas [appellees'] ongoing use of the Condom Sense marks or the current lawsuit in which [appellees'] right to use such marks is at issue." Appellants also stipulated that they did not otherwise contradict their statements that no other person was entitled to use the marks.

The trial court found that when the Texas registrations were sought, (1) appellants were aware of appellees' use of the marks; (2) appellants did not disclose this use, the existence of the lawsuit, or the fact there was a dispute over the right to use the marks; and (3) the Texas application for service mark registration expressly requests information about use by others of the marks for which a registration is sought. The trial court also found CSI "obtained its Texas 'Condom Sense' service mark registrations fraudulently" and concluded such registrations were to be cancelled. The trial court did not award appellees any attorney's fees incurred in canceling the registrations. *See*

-22-

TEX. BUS. & COM. CODE ANN. § 16.28(b)(1) (person injured by fraudulent procurement of registration may recover damages, including attorney's fees).

Appellants contend the trial court abused its discretion by canceling the registration of each Texas service mark because appellees failed to present any evidence or "at a minimum, sufficient evidence" to establish that CSI "knowingly made fraudulent representations" on its applications for registration. They also argue there is no evidence to support the necessary finding that appellees were injured by the registration of the Texas marks as required by section 16.28 of the Texas Business and Commerce Code.

Section 16.28 prohibits a person from procuring an application or registration of a mark by knowingly making a false or fraudulent representation or declaration. *Id.* § 16.28(a). Under that section,

> A person injured by the false or fraudulent procurement of an application or registration may sue the person who violated Subsection (a) of this section in a district court having venue and
>
> (1) recover from him damages resulting from use of the fraudulently registered mark, plus costs of suit, including attorneys' fees; and
>
> (2) have the registration cancelled.

*Id.* § 16.28(b); *cf. id.* § 16.25(a) ("A person who believes that he is or will be damaged by a registration under this chapter may sue to cancel the registration in a district court having venue."). Appellees bear the burden of establishing the requirements of section 16.28(b)—that is, that (1) they were "persons injured" by (2) the false or fraudulently procured application or registration. *See King-Size, Inc.*, 547 F. Supp. at 1167–68 (court can cancel trademark registration if defendant establishes ground for cancellation in section 16.16(a)(4)); *Cano v. Macarena*, 606 S.W.2d 718, 723 (Tex. Civ. App.—Corpus Christi 1980, writ dism'd) (defendant has burden to establish certificate

of registration should be cancelled).

Although the trial court made numerous findings related to whether the registrations were fraudulently procured to support appellees' fraud cancellation claim, there are no findings related to whether appellees were "persons injured" by CSI's alleged fraudulent procurement. Appellees' arguments on appeal address only the evidence supporting the "false or fraudulent procurement" prong of section 16.28; they do not point us to any evidence, nor did we find any, to show they were injured or otherwise harmed by CSI's fraud in the procurement of the registrations. Without a showing of injury or harm under section 16.28 by appellees, the registrations were not properly cancelled. Accordingly, we conclude the trial court abused its discretion when it cancelled CSI's four Texas service mark registrations and sustain appellants' first issue.

## 2. Issue Two: Cancellation of the Federal Service Mark Registration

Appellees also counterclaimed for cancellation of CSI's federal service mark registration because the registration of the mark by Ansell (1) was abandoned prior to Ansell's assignment of the mark to CSI and (2) was issued and maintained through fraud. Appellees' fraud allegation was based on Ansell's failure to disclose on its statement of use that Ansell's "claimed use of the mark was solely through a licensee." They alleged Ansell's registration was maintained through fraud because of Ansell's statements on its 2001 declaration of continued use that the mark "has been in continuous use" in retail store services for five consecutive years even though Ansell had never directly used the mark for retail store services and the license agreement by which Ansell's only licensee used the mark expired on April 1, 1999. Those allegations also supported appellees' contention that Ansell abandoned the mark by nonuse before assigning the mark to CSI in 2005. The trial court made findings and conclusions in favor of appellees on both grounds asserted for cancellation of the federal registration. Our focus, however, is on the abandonment claim because that claim resolves

appellants' second issue.

As to abandonment, the trial court found (1) the license agreement between Ansell and CSI expired on March 31, 1999; (2) CSI did not enter into any other license agreement with Ansell other than the original expired license agreement; (3) Ansell never directly used the service mark in commerce; (4) once the license agreement expired, any commercial use of the mark by Ansell ceased and CSI's continued use was unauthorized and constituted infringement; (5) Ansell did not use the service mark in commerce between April 1, 1999 and February 2, 2005 or have any intent to do so; and (6) at the time of the February 2, 2005 assignment of the mark to CSI, Ansell "had no business goodwill associated with the 'Condom Sense' service mark in Class 42 because Ansell had made no commercial use of the mark since April 1, 1999." The trial court also found that by no later than May 2004, Ansell had abandoned the class 42 Condom Sense mark and concluded that at that time, the mark was no longer valid.

### a. Applicable Law

Under the Lanham Act, a party may seek cancellation of a registered mark at any time if the registered mark has been abandoned by the mark's owner. 15 U.S.C.A. §§ 1064(3), 1115(b)(2). "Abandonment is trademark law's way of recognizing that '[t]rademark rights flow from use.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1173 (11th Cir. 2002) (quoting *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1550 (11th Cir. 1986)). Because these rights result from the use of the mark in commerce and not from mere registration of the mark, "the owner of a mark will lose his exclusive rights if he fails actually to use it." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 954–55 (7th Cir. 1992) (citing 15 U.S.C.A. § 1127).

A party seeking cancellation of a registration based on abandonment must prove that the owner of the mark both (1) discontinued use of the mark and (2) did not intend to resume its use in

the reasonably foreseeable future. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 293 (5th Cir. 2004); *Silverman v. CBS Inc.*, 870 F.2d 40, 45 (2d Cir. 1989); *see also* 15 U.S.C.A. § 1127 (mark deemed abandoned when "its use has been discontinued with intent not to resume such use").[8] Intent not to resume use of a mark may be inferred from the circumstances. 15 U.S.C.A. § 1127. The "use" required is the bona fide use of the mark in commerce. *Id.*

Nonuse of a mark for a period of three consecutive years constitutes prima facie evidence of abandonment. *Id.* The prima facie case "eliminates the challenger's burden to establish the intent element of abandonment as an initial part of [his] case and creates a rebuttable presumption that the registrant abandoned the mark without intent to resume or commence use under the statute." *Rivard v. Linville*, 133 F.3d 1446, 1449 (Fed. Cir. 1998) (internal quotations omitted). This presumption shifts the burden to the owner of the mark to produce evidence of actual use during the relevant time period or intent to resume or commence use, although the ultimate burden of proof remains with the party asserting cancellation. *Id.*; *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). This means the owner must proffer sufficient evidence to support a reasonable jury finding of "the nonexistence of the presumed fact." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 149 (2d Cir. 2007). Vague or subjective assertions of possible future use are not enough to defeat a claim of abandonment. *Vais Arms, Inc.*, 383 F.3d at 294 (self-serving statements of intent to resume use not enough); *Silverman*, 870 F.2d at 47. Evidence of the owner's renewal of the registration of the mark also is insufficient to rebut the prima facie proof of abandonment. *AmBrit, Inc.*, 812 F.2d at

---

[8]Appellants maintain appellees must prove their claim of abandonment by "clear and convincing evidence," citing *Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 683 F. Supp. 2d 1006, 1017 (W.D. Mo. 2010). There is some disagreement in the courts, however, on the proper burden of proof. For example, some courts describe the challenger's burden of proof as "heavy" or requiring "strict proof." *See, e.g., Cumulus Media, Inc.*, 304 F.3d at 1175. Other courts require the challenger to establish abandonment by a preponderance of the evidence. *See, e.g., Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000); *Cerveceria Centroamericana, S.A. v. Cerveceria India, Inc.*, 892 F.2d 1021, 1023 (Fed. Cir. 1989). We express no opinion on which standard is the correct standard because even under a heightened standard, appellees proved their claim of abandonment.

1550.

### b. Analysis

Appellants contend the trial court abused its discretion by canceling the federal registration based on abandonment because the court's findings and conclusions are not supported by sufficient evidence. Specifically, appellants argue the trial court ignored the evidence presented at trial showing the license agreement did not expire in 1999. Appellants maintain Kahn's testimony established "the license agreement was extended beyond the 1999 date" and that CSI "continued to operate the mark with the permission of Ansell"; they claim appellees presented "no witnesses with personal knowledge who could contradict" this testimony. Appellants also maintain the extension of the license agreement was "implicitly testified to by Ansell" when it filed its 2001 declaration of continued use because Ansell relied on appellants' use of the mark to support the declaration. Appellees respond that the evidence presented at trial clearly established the license agreement expired at the end of its five-year term and from that point forward, Ansell made no further use of the mark in commerce for retail store services.

It bears noting that the question of whether the license agreement expired is crucial to the determination of whether Ansell abandoned the mark before the February 2005 assignment. That is because the parties agree that Ansell's rights in the mark can be maintained through the use by a licensee and that Ansell relied on its licensee's use to support its registration of the mark for retail store services.[9] The parties also agree CSI was the only entity to which Ansell granted a license to use the mark and that appellants have used the mark continuously since the first Condom Sense retail location opened in the early 1990s. So, if the license agreement remained in force, Ansell did not

---

[9] Appellees maintain, however, that the USPTO's rules of practice require the registrant to disclose that the use is through another and a failure to make this disclosure constitutes fraud.

-27-

abandon the mark. But if the license agreement expired as the trial court found, then Ansell's use of the mark ceased.

The license agreement between Ansell and CSI granted CSI a license to use the mark for a five-year term, which began on April 1, 1994. The agreement contained an option to renew for an additional term but required CSI to exercise that option by providing written notice of its intent to renew sixty days before the term expired. If CSI did not do so, the agreement would expire by its terms.

The trial court heard testimony from two of Ansell's trademark administrators, Gier and Monroe; Monroe testified as Ansell's corporate representative. Gier was the administrator at the time the license agreement came into effect. Gier testified that during her tenure, CSI was the only licensed user of the mark and that she was unaware of any agreements with CSI or the Kahns to extend the license agreement beyond the initial five-year term. Gier also confirmed she did not extend a verbal license to the Kahns.

Monroe testified she first learned of the license agreement with CSI in November 2004 after receiving correspondence from the Kahns' lawyer. Monroe testified that in her review of Ansell's records, she found nothing to show that CSI's license was renewed or extended after it expired in 1999. In particular, she found no sixty-day written intent to renew sent by CSI or the Kahns as required by the terms of the license agreement. And she found nothing in Ansell's records suggesting the Kahns received a verbal renewal of the license.

Monroe also testified that renewal of the license agreement was conditioned upon other factors, such as the licensee being current with its royalty payments. Yet Monroe testified she found no response from the Kahns to Ansell's correspondence about delinquent royalty payments. She confirmed that Ansell's records showed no royalty payments were made by Kahn after 1995, and no

–28–

royalties were paid by either Marcia or her son after September 1996. Monroe did not find anything in the file indicating Ansell followed up with the Kahns on the issue of royalties. She revealed that Ansell did not have any procedures in place that could be implemented in the event of a default on royalty payments. Monroe testified that although Kahn believed he "made good" on the rest of the royalty payments, he never provided any documentation to that effect.

Based on her review of the license agreement and related records, Monroe testified that Ansell's position was that the license agreement had expired in 1999. She specifically conveyed that position to the Kahns' lawyer in correspondence dated November 2, 2004, stating "[y]ou will notice that the [license] agreement was for a term of 5 years, therefore if the terms of the agreement were met this agreement would have expired in 1999." She then asked that Kahn "fulfill the terms of the *expired agreement*" so they could move forward. (Emphasis added). She repeated that position in an email to appellants' trial counsel explaining the events leading up to Ansell's decision to sell the mark. Monroe wrote:

> Since [Kahn] no longer had licensed rights to the mark, we were free to sell it to anyone. . . . since we werent [sic] using the mark we would have had to abandon the registration, that June, I believe, which was when the renewal was due, so selling was a no brainer.

Monroe verified that Ansell's only retail use of its service mark was through CSI as a licensee and testified that there were no other uses by Ansell to support the January 2001 declaration of continued use in the context of retail store services.

Appellants argue Monroe's testimony does not contradict Kahn's testimony that the license agreement was extended because "she acknowledged that she had no personal knowledge of whether or not the license was extended, but that it was possible an oral extension could have been granted." Although Monroe testified she was not aware of any conversations Kahn may have had with others,

–29–

such as Ansell's outside counsel, in the time before she was hired, she also testified that "knowing Ansell," she did not think "anybody would grant a verbal" license to Kahn for the use of the mark. In addition, the express language of the license agreement stated that any modifications or amendments to the license agreement were required to be in writing.

Kahn testified the extension of the license was based on his continued purchasing of Ansell's products and his conversations with Ansell through business dealings. But it was within the trial court's prerogative to credit Monroe's testimony against him and in favor of abandonment. Despite testifying to his business dealings with Ansell, Kahn could not point to any communications with Ansell from 1998 through 2004 about licensing. Tellingly, Marcia testified that she (1) was unaware of any other agreement between CSI and Ansell, (2) did not know why royalties were not paid, and (3) cannot point to any communications between her or her son and Ansell between April 1999 and 2004. Marcia also did not remember any documents that would counter Ansell's contention that the license agreement expired in 1999.

Appellants argue that evidence of an extension of the license "implicitly" comes from the January 2001 declaration of continued use; they reference a handwritten note on a letter from Ansell to outside counsel transmitting material related to the declaration. The note read: "Laura - Call Condom Sense Marsha [sic]." Appellants maintain that if Ansell no longer had a relationship with appellants after 1999, "there would be no reason for Ansell to be contacting them as part of the declaration process." But appellants did not present any evidence that a representative of Ansell actually contacted Marcia in 2001; Marcia could not remember any communications with Ansell between 1999 and 2004. Nor did they produce any evidence that the material submitted in support of the declaration related to the Condom Sense retail stores owned by the Kahns. At best, this evidence shows Ansell's last contact with the Kahns may have been in January 2001.

In addition to the assertion that the license agreement was extended, appellants make several assertions from which they claim the trial court could have inferred that Ansell was using the mark. Appellants first rely on the events surrounding the assignment of the mark; they maintain that if the mark had been abandoned, "there would have been no reason for [Edwards] to attempt to purchase the mark" from Ansell. Appellants also point to the representation made by Ansell in the assignment that Ansell "has adopted, used, and is using" the Condom Sense mark. Appellants also rely on inferences from the cease-and-desist letters Monroe sent to Edwards in December 2004 and January 2005. The letters instructed Edwards to cease infringing on the mark, which appellants claim evidences "Ansell's use of the mark in January 2005." In addition, Monroe wrote that Ansell "has been using" the mark in connection with retail store services.

Although the assignment and letters state that Ansell was "using" the mark, that evidence is contradicted by Monroe's own testimony stating Ansell had stopped using the mark. Specifically, Monroe testified that Ansell had never used the mark for retail store services, Ansell's only use supporting its registration was through the use authorized under the license agreement, and as of November 2, 2004 (three months before the assignment was signed and one month before the first cease-and-desist letter), Ansell's position was that the license agreement with CSI had expired in 1999 and therefore, neither CSI nor the Kahns had any licensed rights to the mark. Monroe testified that Ansell sold the mark to Kahn because Ansell would not have had a valid registration for the mark "if it wasn't for the use of Mr. Kahn's storefront," adding that because Ansell did not have a storefront and was not using the mark, "it's either sell it or let it go." Appellants provide no explanation for the inconsistency.

Appellants further point to Monroe's corporate representative testimony related to the documents supporting Ansell's January 2001 declaration of continued use. In a letter from Ansell

to outside counsel, an Ansell representative provided a list of materials that supported the declaration, including four issues of Ansell's newsletter "Condom Sense" that were dated in 1999 and 2000. Appellants maintain the newsletters show Ansell's use of the mark in retail store services because Monroe testified these newsletters could have been distributed and placed on shelves in retail stores. But Monroe also testified she was not aware that the newsletter had been in existence and affirmed that since she started with Ansell in May 2001, she did not recall seeing a contemporaneous newsletter going out under the name "Condom Sense." Monroe further clarified that Ansell's statements of use in the declaration would not refer to anything other than the use provide by the Kahns' retail stores.

Appellants claim appellees desire "to discount" evidence that appellants "have used and advertised the mark for almost two decades." Our focus, however, is on Ansell's use of the mark for retail store services between 1999 and the time it sold the mark in 2005. CSI's use of the mark was defined in the license agreement; once the license to the mark ended, CSI had no right to continued use of the licensed mark. Any subsequent use by appellants constituted infringement, not use. *See Prof'l Golfers Ass'n of Am. v. Bankers Life & Cas. Co.*, 514 F.2d 665, 670 (5th Cir. 1975); *see also Sound Surgical Techs., LLC v. Leonard A. Rubinstein, M.D., P.A.*, 734 F. Supp. 2d 1262, 1270 (M.D. Fla. 2010).

In addition to the findings related to the expiration of the license agreement and Ansell's nonuse of the mark after that time, the trial court also found that by no later than May 2004, Ansell had abandoned the class 42 Condom Sense mark. Monroe conceded she had no personal knowledge of anything that happened before she started employment with Ansell in May 2001. Referring to the January 2001 declaration of continued use, Monroe testified that Ansell could have received material from the Kahns to support the declaration (although the January 2001 letter to Ansell's outside

–32–

counsel listing the documents supporting the declaration does not reference material related to the Kahns' Condom Sense stores). Monroe affirmed that at the time Ansell filed the 2001 declaration of continued use, there were no other licensees or any direct use of the mark by Ansell as of the date of the declaration that would support use of the Condom Sense mark for retail store services. She further testified that after she started employment with Ansell in May 2001, Ansell's only use of the service mark in the retail category had been through the use of the licensee.

Based on our review of the evidence before the trial court, we conclude a reasonable fact finder could have concluded the license agreement expired as of March 31, 1999. *See All Am. Builders, Inc.*, 991 S.W.2d at 487 (court acts within discretion when it makes decision based on conflicting evidence). When the license agreement expired at that time, Ansell's vicarious use of the mark also ended.

From the time the license agreement expired until the time of the assignment in February 2005, Ansell had not used the mark for at least three consecutive years.[10] This is true regardless of whether the trial court identified a period beginning in April 1999 (at the time the license agreement expired) or May 2001 (the time when Monroe started employment at Ansell). Once the three-year period of nonuse was shown, the statutory presumption of abandonment arose, triggering appellants' burden to produce evidence of actual use or an intent to resume or commence use. *See Emergency One, Inc.*, 228 F.3d at 536; *Silverman*, 870 F.2d at 47. That is, appellants were required to adduce sufficient evidence to permit a reasonable fact finder to conclude that, in the three-year period of nonuse, Ansell nevertheless maintained an intent to resume use of its registered mark in the

---

[10]Even if appellants' assertion that Ansell was "using" the mark in January 2005 when Monroe sent the last cease-and-desist letter to Edwards was correct, Ansell's subsequent use in 2005 does not retroactively cure its past abandonment. *See AmBrit, Inc.*, 812 F.2d at 1550 (a mark may be cancelled for abandonment even after holder resumes use of the mark). Nor does it show that Ansell intended to use the mark during the period of nonuse. *Id.*

–33–

reasonably foreseeable future. *ITC Ltd.*, 482 F.3d at 149. We conclude appellants did not overcome the presumption.

As explained above, appellants' arguments that Ansell was "using" the mark fail because they were contradicted by Monroe's testimony and the trial court's related findings. Appellants' remaining argument is that Ansell's attempts to license the mark to others constitutes evidence of its intent to use the mark.

We agree that evidence of attempts to license a mark can rebut a presumption of nonuse. *See Sands, Taylor & Wood Co.*, 978 F.2d at 956. But the only evidence of attempts to license the mark to others in this case was brief testimony from Monroe in which she stated, "[w]e've made attempts to license to others, but they weren't interested." Monroe does not provide a time frame during which Ansell attempted to find other licensees. *See ITC Ltd.*, 482 F.3d at 149 n.9 (noting that where mark owner seeks to rebut presumption, the evidence of the "mark holder's intent to resume use of the mark must be formulated during the three-year period of non-use"). Nor did she identify any potential licensees of the mark. Rather, Monroe testified she was unaware of Ansell's doing anything, such as "going out and trying to generate potential licensees," "any efforts by Ansell to build up any goodwill" in the mark, or any plans by Ansell from May 2001 forward "to go out and drum up licensees for use of the Condom Sense mark in the retail Class 42 arena." Appellants submitted no other evidence to support the existence of any purported licensing attempts by Ansell. The trial court reasonably concluded that this testimony, without more, was not sufficient evidence from which an intent to resume use of its registered mark could be reasonably inferred. *Id.* at 150.

In this case, the evidence presented to the trial court showed no bona fide use of the mark by Ansell and no intent to resume use in the reasonably foreseeable future. *See Vais, Inc.*, 383 F.3d at 293. Accordingly, we conclude the trial court acted within its discretion when it cancelled the

federal service mark registration because of abandonment. We overrule appellants' second issue. Based on our resolution of this issue, we need not resolve whether the federal service mark registration was issued and maintained by fraud because of Ansell's failure to disclose that its use was through its licensee. *See* TEX. R. APP. P. 47.1.

### C. Issue Five: Appellees' Affirmative Defenses

The 1997 agreement is the starting point to the events leading up to this lawsuit. That is because Edwards contends the 1997 agreement gives him and his assigns, like the Smiths, permission to use the Condom Sense name and mark at any location, not just the location at 3609 Greenville. And based on this claimed right, appellees named their retail locations Condom Sense and used the service mark in connection with their businesses. Appellants disagree with appellees' contention and claim the 1997 agreement gave Edwards permission to use the Condom Sense name only at the store located at 3609 Greenville. They maintain that any use outside of the scope of the 1997 agreement constitutes infringement, unfair competition, and cyberpiracy.

Although the parties offer different interpretations of the 1997 agreement as it relates to appellants' claims, we need not resolve that conflict at this time because we conclude that based on the evidence presented at trial, it was reasonable for the trial court to determine appellants' claims were barred by laches.[11] Appellants argue in their fifth issue that appellees presented no evidence to support any of their asserted affirmative defenses, including laches and other equitable defenses. They maintain the trial court therefore abused its discretion by concluding appellants were barred

---

[11] We recognize that the trial court did not expressly conclude that laches bars appellants' causes of action and on that basis, appellees chose not to address appellants' contentions related to laches. The trial court, however, did make findings of fact related to the laches defense. Any omitted conclusions of law relating to laches therefore would be relevant to this legal theory. Thus, although the trial court made no legal conclusion regarding whether appellants' causes of action were barred by laches, we will consider whether the judgment can be affirmed on this basis. *See Wells Fargo Bank*, 360 S.W.3d at 706 n.5; *Stable Energy, L.P.*, 999 S.W.2d at 547; *cf. Leonard v. Eskew*, 731 S.W.2d 124, 131–32 (Tex. App.—Austin 1987, writ ref'd n.r.e) (noting appellate court is bound to assume the validity of the judgment, requiring us to "construe the judgment itself and any attendant findings of fact and conclusions of law in a way that sustains the judgment" and assuming "the trial court determined favorably to the judgment any omitted findings of fact or conclusions of law necessary to the relief ordered").

from recovering on their causes of action because of these defenses.

### 1. Applicable Law

A laches defense embodies the principle that "equity aids the vigilant and not those who slumber on their rights." *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 708 (5th Cir. 1994). Unlike statutes of limitations, "laches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced . . . ." *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946). A laches defense operates to estop the owner of the mark from asserting its rights in the mark under state or federal law. *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1355–56 (E.D.N.Y. 1994); *Gulf, Colo. & Santa Fe Ry. Co. v. McBride*, 322 S.W.2d 492, 500 (Tex. 1958) (op. on reh'g). The defense does not deprive the mark's owner of the right to use the mark, but it may deprive the owner of any remedy for infringing uses by others. *Dial-A-Mattress Operating Corp.*, 841 F. Supp. at 1355–56; RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 31 cmt. a. Laches is applicable to claims under the Lanham Act, as well as claims at common law and under state trademark registration statutes. *See* 15 U.S.C.A. § 1115(b)(9); *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1040–41 (2d Cir. 1980). The Lanham Act expressly provides that awards of injunctive and monetary relief are subject "to the principles of equity." 15 U.S.C.A. §§ 1116(a), 1117(a); *Proctor & Gamble Co. v. J.L. Prescott Co.*, 102 F.2d 773, 780 (3d Cir. 1939) (laches may act to bar both monetary and prospective injunctive relief); *see also Qaddura v. Indo-European Foods, Inc.*, 141 S.W.3d 882, 889 (Tex. App.—Dallas 2004, pet. denied) ("The remedies available for trademark infringement are based on principles of equity.").

Courts commonly define laches as "'an inexcusable delay that results in prejudice to the defendant.'" *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) (quoting

*Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 153 (5th Cir. 1985)). The defense consists of three interrelated elements that the party asserting the defense must prove: (1) an unreasonable delay in asserting a right or claim; (2) that is not excused; and (3) that results in undue prejudice to the defendant. *See Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir. 1982); *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 50 (Tex. App.—Houston [14th Dist.] 1992, no writ); *see also Gulf, Colo. & Santa Fe Ry. Co.*, 322 S.W.2d at 500 (laches results from "an unreasonable delay which has worked injury to another person"). The period of laches begins when the owner of the mark had knowledge of the allegedly infringing use. *Elvis Presley Enters.*, 141 F.3d at 205; *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1082 (5th Cir. 1997). Given the elements of laches, "it is plain that the time spectrum for their application is critical." *Armco, Inc.*, 693 F.2d at 1161. Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the owner's objection to such acts. *Elvis Presley Enters.*, 141 F.3d at 205.

Because laches is an equitable doctrine, its application depends on the facts of the particular case. *See Brown v. Cont'l Can Co.*, 765 F.2d 810, 814 (9th Cir. 1985); *Esso Int'l, Inc. v. SS Captain John*, 443 F.2d 1144, 1150 (5th Cir. 1971) (existence of laches to be determined by court "after weighing the equities as they appear from the facts of each case"). A trial court generally enjoys "considerable discretion" in deciding whether to apply the doctrine of laches to the claims pending before it. *Nat'l Ass'n of Gov't Emps.*, 40 F.3d at 707. A court's decision on laches is therefore reviewed for an abuse of discretion. *See id.*; *see also Oxxford Clothes, Inc.*, 109 F.3d at 1082 & n.16; *Clamp Mfg. Co. v. Enco Mfg. Co.*, 870 F.2d 512, 514 (9th Cir. 1989); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 31 cmt. a.

### 2. Analysis

There appears to be no factual dispute regarding when appellants first had knowledge of

Edwards's use of the Condom Sense mark, which they considered to be outside the scope of the 1997 agreement. The parties dispute the legal conclusion to be drawn from the facts. In 2001, Edwards, through J&J No-Limit, opened a new Condom Sense store located in Deep Ellum, and on October 11, 2001, the Kahns' lawyer sent Edwards a cease and desist letter demanding that he discontinue this use of the name and mark. Edwards (through Ramos) responded to the letter and communicated that he believed that based on his interpretation of the 1997 agreement, he had the right to use the name and mark and open additional Condom Sense stores. The Kahns' lawyer notified Edwards on October 16, 2001 that Edwards's "right to use" was limited.

Based on this evidence, the trial court reasonably found that by October 16, 2001 at the latest, appellants had knowledge that Edwards's position on the scope of the rights conferred in the 1997 agreement differed from appellants' interpretation. Specifically, the trial court found that on that date, appellants had knowledge that Edwards was taking the position that the 1997 agreement did not limit his use of the Condom Sense name and associated marks to only one store located at 3609 Greenville. Thus, because of the inherent relationship between appellants' causes of action and the scope of the "right to use" provision in the 1997 agreement, October 16, 2001 is the date from which to measure appellants' knowledge of the alleged infringing use. *See Elvis Presley Enters.*, 141 F.3d at 205. Appellants filed this suit on December 13, 2006, over five years after they first alleged Edwards's use outside the 1997 agreement constituted infringement.

Appellants do not offer a different date from which to begin the laches period or otherwise challenge the trial court's October 16, 2001 finding. Appellants seek to excuse their delay, however, because a "cease and desist letter was sent in 2001." And they sent Edwards another cease and desist letter in 2003 after Edwards opened a second Condom Sense location. They maintain the cease and desist letters sent to Edwards defeat the laches defense because appellees were aware of their

objections but "acted at their own risk in continuing to use the mark and to open new stores."

The fact that appellants sent cease and desist letters does not, as a matter of law, void a laches defense. *See Abraham v. Alpha Chi Omega*, 816 F. Supp. 2d 357, 362 (N.D. Tex. 2011). Rather, the question of whether laches applies depends on the particular facts of the case. *See Esso Int'l, Inc.*, 443 F.2d at 1150. Here, the facts show the cease and desist letters sent by the Kahns asserted ownership rights in the mark that they did not have at that time. Before CSI received an assignment of the federal mark and registered the four service marks in Texas, CSI was a licensee of Ansell. As a licensee, CSI did not receive title to the mark, but rather, it received a "transfer of limited rights, less than the whole interest which might have been transferred." *Acme Valve & Fittings Co. v. Wayne*, 386 F. Supp. 1162, 1165 (S.D. Tex. 1974). As noted in the previous section, Ansell had abandoned its service mark registration by no later than May 2004. So, until May 2004 and including the time when the Kahns sent the cease and desist letters to Edwards in 2001 and 2003, title to the mark remained with Ansell.

In particular, the Kahns asserted in the October 11, 2001 cease and desist letter that "[s]ince as early as December, 1991, [the Kahns and CSI] have become the *exclusive owner* of the Condom Sense trade name for novelty stores." (Emphasis added). Monroe testified that based on her understanding of Ansell's rights in the mark at that time and the license agreement, including the events leading up to the license agreement, the statements made in the October 2001 letter were not true statements. She testified it was Ansell's responsibility to decide what to do with potential infringers, Ansell was unaware that the Kahns' lawyer had sent this letter to Edwards, and she found nothing in Ansell's records from the Kahns or CSI informing Ansell of the alleged infringement. The first time Ansell learned of Edwards's potential infringement was November 2004.

-39-

The cease and desist letter the Kahns' lawyer sent Edwards in March 2003 made similar representations regarding the Kahns' or CSI's ownership rights. The letter stated that Kahn was the "recognized pioneer" of the adult novelty store concept in the country. The letter added that Kahn "started Condom Sense, Inc. in 1992, developed the look of the logo and shortly thereafter obtained the right to use the trademark Condom Sense." The letter does not mention that he received the right to use from Ansell; rather he claimed his "pioneering concept" at that time was "new." Appellants provide no authority for their contention that a cease and desist letter defeats a laches defense when the objections made in the letter are based on a misrepresentation of the rights to a mark.

In December 2003, the Kahns, along with CSI and SKCS Rubber, took it one step further and filed suit against Edwards and J&J No-Limit, asserting a breach of contract action and asking that Edwards cease using the Condom Sense name. But based on Ansell's rights in the mark, which the trial court found still remained until May 2004, neither the Kahns nor CSI had the right to sue for potential infringement. Further, that lawsuit was then voluntarily nonsuited a little over a year later. The trial court found the voluntary nonsuit of that lawsuit was not consistent with appellants' attempts to preclude appellees' use of the name and mark asserted in this lawsuit. The trial court also found that the voluntary nonsuit of its claims implicitly indicated to appellees "that nothing would be done about [appellees'] purportedly infringing use of the 'Condom Sense' name and/or associated marks." The trial court's findings are reasonable given the evidence before it that Ansell had title to the mark throughout the time the Kahns and CSI were asserting their rights to the mark.

Appellants offer another excuse for the delay. They argue Kahn testified he did not file suit after learning in 2001 of the use at the Deep Ellum location because "he believed the Deep Ellum store would not survive, which later proved to be true." But this strategy of not acting at that time conveyed the message that the Kahns did not intend to follow up on their challenges to Edwards's

use. Kahn's inaction also conveyed the message that because of the 1997 agreement, Edwards's use was authorized. A strategy of inaction does not justify sleeping on your rights or provide an explanation for the delay in bringing suit. The 2003 cease and desist letter followed the previous threat of legal action, which was not pursued at that time even though Edwards did not stop using the Condom Sense name and mark (because he considered his use to authorized under the 1997 agreement).

In the context of laches, courts often use analogous statutes of limitations to create a "presumption of laches." *See Tandy Corp. v. Malone & Hyde, Inc.*, 769 F.2d 362, 365 (6th Cir. 1985); *see also Oxxford Clothes, Inc.*, 109 F.3d at 1082 n.17. Under this principle, it is "presumed" a cause of action is barred if it is brought outside the limitations period and is "alive" if brought within the limitations period. *See Tandy Corp.*, 769 F.2d at 365; *Oxxford Clothes, Inc.*, 109 F.3d at 1082 n.17; *Layton Pure Food Co. v. Church & Dwight Co.*, 182 F. 35, 40 (8th Cir. 1910) (except under "unusual conditions or extraordinary circumstances," court applying analogous statute of limitation will not bar damages remedy in infringement case if limitation statute would not bar the action). Thus, if the analogous statute of limitations has elapsed, there is a strong presumption that plaintiff's delay in bringing the suit for monetary relief is not reasonable. *See Tandy Corp.*, 769 F.2d at 365–66.

In this case, the trial court applied a four-year statute of limitations and determined appellants had four years to challenge Edwards's "interpretation of the 1997 Agreement and/or seek to limit his use of the 'Condom Sense' [name] and/or associated marks . . . to the 3609 Greenville Avenue location." Although appellants contest the trial court's conclusion that their claims were time-barred, arguing the trial court misinterpreted the law because relief is not barred for causes of action that constitute continuing torts (issue six), they do not contend their claims are governed by a different

–41–

limitations period. *See OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 736 (Tex. App.—Dallas 2007, pet. denied) (unchallenged findings are binding on appellate court unless contrary established as matter of law or no evidence supports the finding); *cf. Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 859–60 (N.D. Tex. 2009) ("In Texas, a 'Lanham Act violation is governed by the four year statute of limitations under Texas law.'") (quoting *Edmark Indus., SDN. BHD. v. S. Asia Int'l (H.K.) Ltd.*, 89 F. Supp. 2d 840, 846 (E.D. Tex. 2000)). Because appellants filed suit over five years after they gained knowledge of the alleged infringing use, there had been an unreasonable delay in bringing suit. The cease and desist letters asserting claims of ownership were contradicted by the evidence before the trial court of Ansell's rights to the mark, and therefore did not suffice to avoid laches in the five years before they filed this lawsuit.

Appellees must also show the existence of undue prejudice. "Whether phrased as 'reliance' or 'prejudice', the effect is the same—the defendant has done something it otherwise would not have done absent the plaintiff's conduct." *Conan Props., Inc.*, 752 F.2d at 153. In this case, the evidence shows that because appellants did not resolve the disagreement over the use authorized under the 1997 agreement, Edwards built up the business and entered into transactions with the Smiths under the assumption that the name and associated marks could be used. Specifically, in reliance on Edwards's position under the 1997 agreement, Smith paid $300,000 for two Condom Sense locations, including the right to use the name and mark, and opened other stores in reliance on that same position. Edwards and Smith also entered into an arrangement for Edwards to run another adult novelty store, which they later renamed Condom Sense, and used the mark. The trial court also found appellees reasonably relied on CSI's voluntary nonsuit of the 2003 lawsuit in investing in and

developing and promoting the Condom Sense name.[12]

To show that the trial court abused its discretion, appellants must demonstrate that no evidence supports the trial court's findings. *Hoss*, 338 S.W.3d at 640. But on these facts and weighing the equities, we cannot say the trial court abused its discretion.

Finally, we recognize that the use of the words "Condom Sense" in the domain names registered by appellees relate to appellants' claim of cyberpiracy. Smith testified he was the person who created appellees' websites and therefore, it was not until after January 2004, when he first purchased the two Condom Sense locations, that appellees' websites were up and running. To the extent it can be argued that appellants did not unreasonably delay in asserting this claim, we conclude it was reasonable for the trial court to determine appellants' claims were barred by their unclean hands.

The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Main. Mach. Co.*, 324 U.S. 806, 814 (1945). The plaintiff's alleged wrongdoing will not bar relief unless the defendant also establishes harm or injury from the plaintiff's conduct. *See Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979). Unclean hands is a defense to Lanham Act claims and unfair competition. *See Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 849 (W.D. Tex. 2001).

---

[12] We also recognize that in other contexts, the elements of laches under Texas law are "(1) unreasonable delay by one having legal or equitable rights in asserting them, and (2) a good faith change of position by another to his detriment because of the delay." *City of Fort Worth v. Johnson*, 388 S.W.2d 400, 403 (Tex. 1964). In this action for infringement, we applied the elements of laches as other courts have done in this context. *See Zapata Corp.*, 841 S.W.2d at 47, 50 ("A common law trademark infringement action under Texas law presents no difference in issues than those under federal trademark actions."). The trial court expressly found that "[a]t all relevant times, [appellees] have had a good faith belief that they have the right to use the 'Condom Sense' name and/or associated marks." So regardless of whether the harm element is defined as "undue prejudice" or a "good faith change of position to his detriment," appellants failed to demonstrate that no evidence supports the trial court's finding. *See Hoss*, 338 S.W.3d at 640.

When Kahn sold the 3609 Greenville location to Edwards, he had already entered into the license agreement with Ansell. That agreement did not permit Kahn or CSI to assign or sub-license the mark. Acting on his own, Kahn sold another party, Edwards, the rights CSI acquired in the license agreement. But "[u]nless a licensor explicitly grants its licensee the right to sub-license the licensed mark, any putative sub-license is invalid as a matter of law." *CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1066 (E.D. Mich. 2011). Monroe testified the license agreement did not permit CSI and Kahn to act as they did. She also testified neither CSI nor the Kahns informed Ansell that the 3609 Greenville location had been sold; again, she was not even aware of appellees until the Kahns sent her the 1997 agreement in November 2004.

Then, based on the rights he bought from Kahn, Edwards sold the right to use the name to the Smiths. Both Edwards and the Smiths have expanded on those rights. Thus, the original sale and each subsequent sale were all based on something that nobody had a right to do in the first place. The trial court specifically found the license agreement did not provide CSI with the ability to grant sublicenses for the use of the Condom Sense name or mark and that Ansell never gave CSI permission to assign its rights as licensee under the license agreement.

Appellants recognize that SKCS Rubber "did not have any authority to give [Edwards] the right to use Ansell's federally registered mark." But that is what Kahn, as SKCS Rubber's president, did. In addition, that argument was made in the context of appellants' assertion that because the 1997 agreement only refers to the "use of the *name*, 'Condom Sense,'" not the service mark, Edwards did not buy "any right to use the mark containing the words 'Condom Sense' with a circle design." (Emphasis added). Appellants maintain a "trade name is not synonymous with a service mark or trademark." Nothing in the record, however, shows that the parties ever made such a distinction. Rather, the record shows the parties used the terms trademark, service mark, and trade

name synonymously. Appellants agree that if a trade name is also used as a service mark, then it may be registered.

The trial court found appellants' "conduct with respect to the 'Condom Sense' name and/or associated marks has been inequitable and marked by a want of good faith" and concluded appellants' claims were barred by their own unclean hands. Based on the record before us, we cannot say the trial court abused its discretion in reaching this conclusion. There is no question that the act of selling something that they did not have the right to sell, directly relates to appellants' assertions of rights in the service mark and name in this case. *See Precision Instrument Mfg. Co.*, 324 U.S. at 814 (1945) (misconduct must be relative to the matter in which relief is sought); *see also* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 29. As stated above, appellees incurred economic expense in moving forward with their concept of adult novelty stores. Accordingly, we overrule appellants' fifth issue.

Based on our resolution of appellants' fifth issue, we need not address appellants' third, fourth, and sixth issues. *See* TEX. R. APP. P. 47.1.

## IV. CONCLUSION

Appellants' issue regarding cancellation of the Texas registrations is sustained because appellees failed to present any evidence, and the trial court made no findings, on the required proof of appellees' injury resulting from the registrations. The trial court's cancellation of the federal registration based on abandonment, however, was supported by the evidence and was within the trial court's discretion as the fact finder. The evidence also supports the trial court's judgment based on appellees' defenses of laches and unclean hands. Accordingly, we reverse the trial court's judgment regarding cancellation of the four Texas service mark registrations but affirm the judgment in all other respects.

_____
MARY MURPHY
JUSTICE

101024F.P05



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CONDOM SENSE, INC., MRSK, INC.,
MRK, INC., MKSK, LLC, MARSTEK,
LLC, SKCMK, LLC, AND MSCK 121,
LLC, Appellants

No. 05-10-01024-CV      V.

JAMAL ALSHALABI A/K/A MIKE
EDWARDS, GREG SMITH,
MONSERRAT SMITH, J&J NO-LIMIT,
INC., CONDOMS ETC., LLC, CONDOM
SENSATION DALLAS LLC, CONDOM
EXPRESS, LLC, AND COMOROS, LLC,
Appellees

Appeal from the County Court at Law No. 2
of Dallas County, Texas. (Tr.Ct.No. 06-17938-B).
Opinion delivered by Justice Murphy,
Justices Lang and Myers participating.

In accordance with this Court's opinion of this date, that portion of the trial court's May 17, 2010 judgment ordering the cancellation of Texas service mark registration numbers 800784273, for the mark "Condom Sense," 800784280, for the mark "Condom Sense & Design," 800784307, for the mark "Condom Sense Est. 1990 & Design," and 800784313, for the mark "Condom Sense Stores & Design" is **REVERSED** and judgment is **RENDERED** that appellees Jamal Alshalabi a/k/a Mike Edwards, Greg Smith, Monserrat Smith, J&J No-Limit, Inc., Condoms Etc., LLC, Condom Sensation Dallas LLC, Condom Express, LLC, and Comoros, LLC take nothing on their counterclaim seeking cancellation of the four Texas mark registrations. We **AFFIRM** the trial court's judgment in all other respects.

It is **ORDERED** that appellees Jamal Alshalabi a/k/a Mike Edwards, Greg Smith, Monserrat Smith, J&J No-Limit, Inc., Condoms Etc., LLC, Condom Sensation Dallas LLC, Condom Express, LLC, and Comoros, LLC recover their costs of this appeal from appellants Condom Sense, Inc., MRSK, Inc., MRK, Inc., MKSK, LLC, Marstel, LLC, SKCMK, LLC, and MSCK 121, LLC.

Judgment entered December 21, 2012.

_____
MARY MURPHY
JUSTICE